In re CITY OF STOCKTON,
CALIFORNIA, Debtor.

No. 12–32118–C–9.

United States Bankruptcy Court,
E.D. California.

June 12, 2013.

Marc A. Levinson, Norman Hile, Jonathan Riddell, John W. Killeen, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA, for Debtor.

Nicholas De Lancie, Jeffer Mangels Butler & Mitchell LLP, San Francisco, CA, for Union Bank, N.A.

Michael S. Gardener, Boston, MA, for Wells Fargo Bank, National Association.

James O. Johnston, Joshua D. Morse, Jones Day, Los Angeles, CA, for Franklin High Yield Tax Free Income Fund and Franklin California High Yield Municipal Fund.

Lawrence A. Larose, Winston & Strawn LLP, New York City, NY, for National Public Finance Guarantee Corporation.

Guy S. Neal, Sidney Austin, LLP, Washington, DC, for Assured Guaranty Corporation and Assured Guaranty Municipal Corporation.

Michael Ryan, K & L Gates, Seattle, WA, for California Public Employees' Retirement System.

Michael J. Gearin, K & L Gates LLP, Los Angeles, CA, for California Public Employees' Retirement System.

Matthew M. Walsh, Winston & Strawn LLP, Los Angeles, CA, for National Public Finance Guarantee Corporation.

## OPINION REGARDING CHAPTER 9 ORDER FOR RELIEF

CHRISTOPHER M. KLEIN, Bankruptcy Judge.

Chapter 9 is unique among voluntary Bankruptcy Code cases in that a municipality must litigate its way to the order for relief before restructuring its debt. Capital markets creditors of the City of Stockton have required the City to prove its eligibility for chapter 9 relief under 11 U.S.C. §§ 109(c) and 921(c). Such a proceeding is like a qualifying round in a competition; success leads only to the main event—the process of achieving a viable plan of adjustment. Without a confirmed plan, a municipality lacks constitutional authority to compel impairment of contracts.

This opinion addresses chapter 9 eligibility issues that arose during the three-day trial on the question whether to order relief and the post-trial motion to alter or amend the findings regarding the strategy adopted by certain creditors. The focus is on pre-filing obligations of the municipality in dealing with creditors and stakeholders. Concluding that the City carried its burden to establish the elements required for an order for relief and concluding that the objectors inappropriately used an issue re-

lating to plan confirmation, but that is irrelevant to eligibility, as a pretext to decline to negotiate in good faith and to force a trial that should not have been necessary, relief will be ordered.[1]

## STATUTORY REQUIREMENTS

As chapter 9 eligibility is governed by Bankruptcy Code §§ 101(32)(C), 101(40), 109(c), and 921(c) and (d), it is appropriate to situate those statutes front and center:

§ 101(32). The term "insolvent" means—

. . .

(C) with reference to a municipality, financial condition such that the municipality is—

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or

(ii) unable to pay its debts as they become due.

11 U.S.C. § 101(32).

\*　　\*　　\*

§ 101(40). The term "municipality" means political subdivision or public agency or instrumentality of a State.

11 U.S.C. § 101(40).

\*　　\*　　\*

§ 109(c). An entity may be a debtor under chapter 9 of this title if and only if such entity—

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 [preferences] of this title.

11 U.S.C. § 109(c).

\*　　\*　　\*

§ 921

(c) After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title.

---

**1.** This is the fifth formal opinion issued in the Stockton case. The first dealt with California's chapter 9 gateway statute. *In re City of Stockton, Cal.,* 475 B.R. 720 (Bankr.E.D.Cal. 2012) (*"Stockton I "*). The second addressed the City's unilateral reduction of health care benefits for retirees. *Ass'n of Retired Employees v. City of Stockton (In re City of Stockton, Cal.),* 478 B.R. 8 (Bankr.E.D.Cal.2012)

(*"Stockton II "*). The third involved the additional automatic stay imposed by 11 U.S.C. § 922(a). *In re City of Stockton, Cal.,* 484 B.R. 372 (Bankr.E.D.Cal.2012) (*"Stockton III "*). The fourth determined that a municipality may, but is not required to, obtain court approval of compromises made during the case. *In re City of Stockton, Cal.,* 486 B.R. 194 (Bankr.E.D.Cal.2013) (*"Stockton IV "*).

(d) If the petition is not dismissed under subsection (c) of this section, the court shall order relief under this chapter notwithstanding section 301(b).

11 U.S.C. § 921(c)-(d).

\* \* \*

Relevant parts of California's gateway statute, Government Code §§ 53760, 53760.1, and 53760.3, also deserve a billing:[2]

§ 53760. A local public entity in this state may file a petition and exercise powers pursuant to applicable federal bankruptcy law if either of the following apply:

(a) The local public entity has participated in a neutral evaluation process pursuant to Section 53760.3.

(b) The local public entity declares a fiscal emergency and adopts a resolution by a majority vote of the governing board pursuant to Section 53760.5.

CAL. GOV'T CODE § 53760.

\* \* \*

§ 53760.1(d). "Good faith" means participation by a party in the neutral evaluation process with the intent to negotiate toward a resolution of the issues that are the subject of the neutral evaluation process, including the timely provision of complete and accurate information to provide the relevant parties through the neutral evaluation process with sufficient information, in a confidential manner, to negotiate the readjustment of the municipality's debt.

CAL. GOV'T CODE § 53760.1(d).

\* \* \*

§ 53760.3(*o* ). The local public entity and all interested parties participating in the neutral evaluation process shall negotiate in good faith.

CAL. GOV'T CODE § 53760.3(*o* ).

§ 53760.3(s). The local public entity shall pay 50 percent of the costs of neutral evaluation, including, but not limited to, the fees of the evaluator, and the creditors shall pay the balance, unless otherwise agreed to by the parties.

CAL. GOV'T CODE § 53760.3(s).

## FACTS

When Bob Deis became City Manager for the City of Stockton on July 1, 2010, the first day of its fiscal year, he encountered a municipality in financial distress. In a progression beginning in 2008, the City Council had declared fiscal emergencies and imposed certain unilateral actions in an effort to staunch the hemorrhage. On June 22, 2010, the Council adopted an "Action Plan For Fiscal Sustainability' " that it hired Deis to implement.

Some of the problems were due to the state of the economy in the Great Recession. Stockton was ground zero for the subprime mortgage crisis. Unemployment was 22 percent; median income for a family of four was about $63,000. Property values, both commercial and residential, had declined by 50 percent.[3] Stockton had one of the highest foreclosure rates in the nation, a fact of which this court is painfully aware from the ordeal of presiding over the tragedy of bankruptcies of literally thousands of individual Stockton citizens who had done nothing wrong other than be seduced by easy credit when purchasing a

---

**2.** A California patois employs the term "AB 506" to refer to the California gateway statute. AB 506 was the bill that, when passed by the legislature and signed by the Governor, enacted the current version of Government Code § 53760.

**3.** Median home sales prices were $422,000 in 2006 and $140,000 in 2012. Declaration of Chief Financial Officer Vanessa Burke, City Exhibit 1062, at page 91. Burke was a credible witness.

home in a housing bubble before being slammed by unexpected loss of income when laid off or furloughed. Property tax, sales tax, and other public revenues characteristic of a functioning municipal economy had plummeted. For example, sales tax revenue declined from $47.0 million in fiscal year 2006 to $32.7 million in fiscal year 2010.[4] Recovery was far over the horizon.

Some problems were due to excessive optimism. In better times, Stockton committed its general fund to back long-term bonds to finance development projects based on an overly-sanguine "if-you-build-it-they-will-come" mentality. They did not come. Hence, project revenues were insufficient to pay project bills.

Some problems were due to encrustation of a creeping multi-decade, opaque pattern of above-market compensation of employees. /Among other things, the City paid for generous health care benefits to which employees did not contribute, including lifetime health care regardless of length of service. It permitted, to an unusual degree, so-called "add-pays" for tasks that allowed nominal salaries to be increased to totals greater than those prevailing for other municipalities. And there were predetermined automatic annual cost-of-living pay increases not tied to the state of the economy or local finances.

The submerged compensation problems included surprisingly generous retirement practices. Pensions were allowed to be based on the final year of compensation, which compensation could include essentially-unlimited accrued vacation and sick leave. This led to a phenomenon of so-called "pension-spiking" in which a pension could be substantially greater than the

retiree's actual final salary. Nor were individual employees required to contribute to their pensions. In consequence, projected pension expenses were soaring.

City management before the Great Recession deserves some of the blame. City accounts were in such disarray that it has taken literally years to unscramble them. Various work rules were contractually agreed upon, often without approval in public view by the City Council, that left little latitude for exercise of managerial supervision. And one wonders about what prior City Councils had been doing.

In each fiscal year during Deis' tenure, fiscal emergencies have continued to be, declared, which have enabled some limitation of the adverse effects of some collective bargaining agreements.

In the fiscal year beginning July 1, 2010, unrepresented employees suffered: furloughs of 96 hours; new medical premiums; and increased health plan deductibles and co-pays. Similar concessions were obtained from collective bargaining units.[5]

In the fiscal year beginning July 1, 2011, the economy measures were racheted up. For unrepresented employees: 96–hour furloughs continued; medical benefits were eliminated for new hires; sick leave accruals were reduced, and limits imposed on sick leave cash-outs at retirement; vacation leave accruals were reduced, and limits imposed on vacation sell-back and accrual maximums; extra salary above Workers' Compensation ceased; longevity "add-pay" was eliminated for certain employees; educational incentive pay was eliminated; employees were required to contribute 7 percent toward their retire-

---

4. Declaration of Deputy City Manager Laurie Montes, City Exhibit 1054, at page 22. Montes was a credible witness.

5. The belt-tightening for all fiscal years beginning July 1, 2008, is documented at Objector's Exhibit 50, pages 70–79.

ment plan; the maximum City contribution to the health plan was decreased. Similar concessions were obtained from collective bargaining units.

Of particular significance to the City's pension expense, age limits were raised, which had the effect of requiring longer service before being able to collect a pension, and the pension calculation was revised to be based on income during the final three years of service, instead of one year of service. The final-three-year provision, coupled with the limits on additives, dampened opportunities for "pension spiking."

Councilmember Kathy Miller testified credibly about the extent of the corrective measures that have been taken since she joined the City Council in January 2009 and about the painful toll inflicted on the City workforce at the cost of impairing basic public services as the Council sought to regain control of the budget and the trust of the people.

In sum, the City workforce decreased by 25 percent from 1,886 on July 1, 2008, to 1,420 on December 31, 2011. This included a 20 percent reduction for police, 30 percent for fire, 38 percent for public works, 46 percent for library, and 56 percent for recreation.

In the middle of the 2012–2013 fiscal year, it was apparent that, despite the four-year struggle to tame the City's finances, its general fund would reach June 30, 2012, with a projected deficit of $8,652,768 unless drastic action was taken.

Accordingly, Deis and his management team, supported by the independent analysis of the consulting firm Management Partners, concluded that it was time to ask the City Council to initiate the neutral evaluation process under California Government Code §§ 53760(a) and 53760.3

that is one of two alternatives preliminary to filing a municipal debt adjustment case under chapter 9 of the Bankruptcy Code.

A 54–page memorandum dated February 28, 2012,[6] from Deis to the City Council projected a $8,652,768 deficit on expenditures of $166,655,282 as of the fiscal year end on June 30 and projected a deficit for the fiscal year commencing July 1, 2012, ranging from $20,207,540 to $38,182,873.

Deis reviewed the present and future options for closing the gaps. He noted that more service reductions were an easy target as 71 percent of general fund expenses are devoted to labor, or viewed by function, 77 percent relates to public safety-police and fire. But, although a further 15 percent cut would save about $20 million, staffing had already been slashed during the three previous years to close gaps of $37 million, $23 million, and $28 million, respectively. The consequences were worrisome.

Public safety was a particular concern. In 2010, Stockton's violent crime rate bucked a nationwide drop and rose to rank it 10th nationally, with 13.81 violent crimes per 1,000 residents. Homicides were at an all-time record. Aggravated Assaults with a Firearm rose from 99 in 2009 to 196 in 2011, and another 30 percent in 2012.

A 15 percent reduction in the police budget would eliminate all 30 community service officers and 64 of about 323 sworn officers. The same reduction in the fire budget would eliminate 41 sworn fire positions, 3 fire engines, and 1 fire truck.

The' Police Chief pointed out that, even without a 15 percent cut, the Police Department had about 1.10 officers per 1,000 residents, compared to a national standard

---

6. City Exhibit 1057; Objector's Exhibit 68.

of 2.7 per 1,000 residents.[7] The police, during peak activity, respond only to crimes-in-progress. Ending the School Resource Officer program was followed by a rise in juvenile crime, gang membership, and a 575 percent jump in gang-related homicides, from 4 to 27. Abolishing the Narcotics Enforcement Team led to more drug traffic and fewer asset forfeiture proceeds. Reducing security camera monitoring from full-time to part-time impaired the ability to spot crimes or follow pursuits.

Deis concluded that these "kind of cuts simply pose too much of a safety risk to our citizens."[8]

This was consistent with the conclusion of the City's consultant, Management Partners, that, as of February 2012, the City was, first, in a state of "service delivery insolvency," which is a municipality's inability to pay for all the costs of providing services at the level and quality required for the health, safety, and welfare of the community, and, second, was in a state of "budget insolvency," which is the inability to create a balanced budget that provides sufficient revenues to pay expenses occurring within the budgeted period. Management Partners also opined that the City was on the verge of "cash insolvency," which is inability to generate and maintain cash balances to pay expenditures as they come due.[9]

The City Council accepted the Deis recommendation on February 28, 2012, and authorized initiation of the neutral evaluation process that California prescribes under Government Code §§ 53760 and 53760.3 as a prerequisite to permission to file a chapter 9 case under the Bankruptcy Code.

The City Council also authorized diversion of various earmarked funds to meet the projected $8,652,768 budget shortfall. Hence, the City suspended payments from the general fund on the 2004 Lease Revenue Bond (Parking), the 2009 Lease Revenue Bonds (Public Facilities Fees), and the 2007 Variable Rate Bonds (City Hall), for which the expected general fund payments due before June 30, 2012, totaled $2,048,658. In the next fiscal year beginning July 1, 2012, general fund payments to service those, and other, bonds were projected at $11,787,182.

As a result of measures authorized by the City Council on February 28, 2012, including not paying $2,048,658 on the bonds, the general fund finished the fiscal year with about $1.3 million on hand.[10] Without the intentional bond default, it would have ended the fiscal year with a deficit exceeding $700,000.

The bond default led Wells Fargo, as bond trustee acting at the behest of National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corp., to have receivers appointed to take over and operate three parking garages (National Public Finance) and the building at 400 E. Main Street intended to serve as the new city hall (Assured Guaranty). Those receivers remain in place and are collecting project revenues.

National Public Finance responded to the notice of the initiation of the neutral evaluation process with notice of intent to

---

**7.** If all authorized 343 sworn officer positions were filled, the ratio would be about 1.16 per 1,000 residents. Declaration of Police Chief Eric Jones, Objector's Exhibit 38, City Exhibit 1061, at page 3. The parties stipulated to introduction of this declaration into evidence without the need for cross-examination.

**8.** City Exhibit 1057; Objector's Exhibit 68, at page 27.

**9.** City Exhibit 1056, at pages 2 and 48–49.

**10.** City Exhibit 1062, at pages 5 & 27–28.

participate as an "interested party" under California Government Code § 53760 by letter dated March 15, 2012, from Matthew Cohn, Director.

But, although § 53760.3(s) requires creditors to pay half of the costs of neutral evaluation unless otherwise agreed, Cohn stated: "National expressly disclaims any obligation or liability for the payment of any costs or expenses under Section 53760.3(s) of the Act or otherwise in connection with the 506 Notice, the Act or pursuant to the 506 Process or otherwise." [11]

Neither National Public Finance, nor Assured Guaranty, nor Franklin Advisors, nor Wells Fargo paid any of the costs or expenses allocated to them by Government Code § 53760.3(s). The City did not agree to pay their share.

Former Bankruptcy Judge Ralph Mabey was selected as the neutral evaluator.

The neutral evaluation process continued for 90 days, having been extended for the additional 30 days permitted by Government Code § 53760.3(t)(3).

The City began by presenting a proposed plan of adjustment in the form of what was termed an "Ask" in which it described how it proposed to deal with the affected parties. The City intended the "Ask" as the opening proposal in a negotiation. Several examples of the proposed treatment of bonds follow.

As to the three parking garages covered by the 2004 Lease Revenue Bond (Parking) and in the hands of a receiver appointed at the behest of National Public Finance Guarantee Corporation, the City did not intend to reestablish a possessory interest or to pay any debt service going forward.[12] The receiver would collect parking revenues until the bonds are paid in full.

As to 2006 Lease Revenue Bonds on the so-called Stewart–Eberhart Building and adjacent parking facility, for which the insurer is National Public Finance, the City proposed debt service relief of five years, followed by five years of interest-only payments, and substituting a pledge of parking district revenues and public facilities fees in place of the backstop of the general fund.[13] The bonds would eventually be paid in full.

As to the issue of 2007 Variable Rate Demand Lease Revenue Bonds, insured by Assured Guaranty, for the intended city hall at 400 E. Main Street, the City proposed debt service relief for five years, followed by five years of interest-only payments, and thirty years of full amortization. The City would pledge all net revenues of the building unto the amount of the originally scheduled debt service, to be backstopped by the general fund up to the amount of restructured debt service.[14] The bonds eventually would be paid in full.

National Public Finance and Assured Guaranty each took the position that there was nothing to talk about unless and until the City also proposed to impair its pension obligation to the California Public Employees' Retirement System ("CalPERS"). When the City declined to do so after the second neutral evaluation meeting with the bondholders, they absented themselves from all further discussions. They did not thereafter indicate a desire to meet again with Judge Mabey.

---

11. City Exhibit 1385, at page 175.

12. City Exhibit 1376; Objectors' Exhibit 50, at pages 756–58.

13. City Exhibit 1376; Objectors' Exhibit 50, at pages 762–67.

14. City Exhibit 1376; Objectors' Exhibit 50, at pages 774–79.

Objector Franklin Advisors did make a counterproposal regarding a different bond issue, which the City concedes was made in good faith but which was too far removed from the relief the City needed on that bond issue to open a path for exploration. Neither Franklin Advisors, nor Wells Fargo as indenture trustee, pursued further discussions with Judge Mabey.

The neutral evaluation process conducted by Judge Mabey achieved agreements to adjust all unexpired collective bargaining agreements and achieved substantial progress in discussions with other stakeholders. The court is persuaded that Judge Mabey would have worked further with the capital market creditors if they had expressed interest. None was expressed.

This case was filed on June 28, 2012, and assigned to the undersigned judge by the chief judge of the court of appeals.

National Public Finance, Assured Guaranty, Franklin Advisors, and Wells Fargo objected to an order for relief.

This litigation ensued. The interval since filing has been consumed, first, by court-ordered mediation with the Hon. Elizabeth Perris, U.S. Bankruptcy Judge, District of Oregon, it being this court's experience that successful reorganizations entail substantial agreement among most of the parties. Second, during that mediation process, time has been consumed developing and exchanging information essential to understanding the City's finances and to the negotiation of a plan of adjustment.

## JURISDICTION

Federal subject-matter jurisdiction is founded upon 28 U.S.C. § 1334. This is a core proceeding that a bankruptcy judge may hear and determine. 28 U.S.C. § 158(d)(1). The chief judge of the court of appeals has designated this bankruptcy judge to conduct the case. 11 U.S.C. § 921(b).

## DISCUSSION

Since the question of whether to order relief is governed by six essential elements prescribed by statute, the analysis will use those elements as an outline.

### I

The first essential element is that the debtor must be a "municipality" as defined in the Bankruptcy Code. 11 U.S.C. § 109(c)(1). A "municipality" is a political subdivision or public agency or instrumentality of a state. 11 U.S.C. § 101(40). The objectors concede that Stockton is a municipality for these purposes.

### II

The second essential element for chapter 9 eligibility is that the municipality must be specifically authorized in its capacity as a municipality or by name, to be a chapter 9 debtor by state law, or by a governmental officer or organization empowered by state law to make such authorization. 11 U.S.C. § 109(c)(2). This element is contested.

As explained in an earlier decision, the initial gateway into chapter 9 is under the control of the state. *Stockton I,* 475 B.R. at 727–28. Hence, California law governs the question whether the City is authorized to be a chapter 9 debtor.

### A

California has enacted a standing authorization for its municipalities to be chapter 9 debtors if they comply with the California Government Code § 53760 by either pursuing a neutral evaluation process or declaring a fiscal emergency. CAL. GOV'T CODE § 53760.

As the City pursued California's neutral evaluation route, our focus is on the terms that govern that process.

## B

The course of the neutral evaluation conducted by former Bankruptcy Judge Mabey is detailed in the evidence. The City presented a tentative plan in the form of a 790–page "Ask" for the purposes of discussions. The evaluation lasted the maximum ninety days permitted by statute, having been extended by the City and a majority of the participating parties. There were more than forty sessions with various interested parties, in the course of which the evaluator engaged in shuttle diplomacy.

The neutral evaluation produced agreements with some of the participating parties, including all unions with unexpired collective bargaining agreements. No agreement was reached with the 2,400 retired employees, there being no common representative with whom to negotiate.

Nor was there agreement with the capital market creditors. They attended only two meetings with the neutral evaluator and, having taken the position that there was nothing to talk about, departed. That the evaluator, who established a record demonstrating conscientious diligence in his mediation task, elected not to attempt to work further with the capital markets creditors warrants the inference that he saw little possibility of bridging their gap with the City.

## C

The objectors contend that, as a matter of state law, the City did not satisfy its good faith negotiation obligation during the California neutral evaluation process. Their rationale is twofold. First, they contend that any proposal that would impair the rights of capital markets creditors without simultaneously impairing Cal-

PERS is not made in good faith. Second, they contend that the City's proposal was made on a take-it-or-leave-it basis without the intention of actually negotiating.

### 1

The objectors' initial challenge to the City's good faith is the first of at least four encounters with the term "good faith" in this case. At the prefiling gateway, California requires good faith negotiations in its neutral evaluation process. CAL. GOV'T CODE § 53760.3(o ).

The next three appearances of "good faith" are Bankruptcy Code provisions. One of four alternatives for establishing the fifth element of § 109(c) eligibility to be a chapter 9 debtor is good faith negotiation with parties who would be impaired under a proposed plan. 11 U.S.C. § 109(c)(5)(B). Next, even if a municipality is eligible under § 109(c), the court may dismiss a case that is not filed in good faith. 11 U.S.C. § 921(c). Finally, a plan of adjustment must be proposed in good faith. 11 U.S.C. § 1129(a)(3), *incorporated by id.*, § 901(a).

As these various versions of good faith in chapter 9 arise in different contexts, they may have different meanings. *Cf. United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 67–68, 53 S.Ct. 278, 77 L.Ed. 619 (1933) (" 'cause of action' may mean one thing for one purpose and something different for another.") (Cardozo, J.). Those varying contexts will be addressed in due course.

### 2

This first of the good faith objections, relating to the California gateway neutral evaluation process, is rejected as a matter of California law.

#### a

Black-letter California law requires the City and all parties participating in the

neutral evaluation process to negotiate in good faith:

> The local public entity and all interested parties participating in the neutral evaluation process shall negotiate in good faith.

CAL. GOV'T CODE § 53760.3(*o* ).

█ It follows that good faith negotiation in the California neutral evaluation process is a two-way street.

California defines "good faith" for purposes of its chapter 9 gateway neutral evaluation process:

> (d) "Good faith" means participation by a party in the neutral evaluation process with the intent to negotiate toward a resolution of the issues that are the subject of the neutral evaluation process, including the timely provision of complete and accurate information to provide the relevant parties through the neutral evaluation process with sufficient information, in a confidential manner, to negotiate the readjustment of the municipality's debt.

CAL. GOV'T CODE § 53760.1(d).

With this duty and this definition in mind, it is beyond cavil that the City negotiated with its various unions toward a resolution of the issues that were the subject of the neutral evaluation process. The fact that pre-filing agreements were reached to modify all unexpired collective bargaining agreements, and that substantial progress was made regarding expired agreements that were resolved soon after the chapter 9 case was filed, persuasively testifies to the City's good faith negotiations for purposes of § 53760(*o* ).

Nor were these union contracts trivial matters. Labor comprised about 71 percent of the City's prefiling budget. The City's 790–page "Ask" included painful cuts to organized labor. The City reports achieving the majority of the concessions it sought from the unions in its "Ask." And, it is this court's experience that organized labor ordinarily resists efforts to reduce compensation and benefits.

Although the objectors complain bitterly that the City was not proposing directly to impair the rights of CalPERS, they do not address the obvious: material reductions in compensation to employees correlatively will tend to reduce the City's future pension obligations. In other words, renegotiated collective bargaining agreements providing for reduced compensation indirectly reduce the City's CalPERS obligations.

█ The question becomes whether good faith renegotiation of collective bargaining agreements where labor expenses exceed two-thirds of a municipality's budget constitutes sufficient good faith to satisfy Government Code § 53760.3(*o* ). This entails a line-drawing exercise. While the question may not be free from doubt, this court concludes that, as a matter of California law, serious and productive negotiations with a category of claimants who represent more than two-thirds of a municipality's annual budget independently suffices to satisfy the good faith negotiation requirement of § 53760.3(*o* ).

b

The objectors took the position that the City was required by the California statute to negotiate with them in good faith but that, insofar as they were concerned, the obligation was not reciprocal. That is, the objectors contended that they had no correlative good faith negotiation obligation. Not so.

As already noted, the California statute imposes the good faith negotiation requirement on all interested parties, including the objectors. CAL. GOV'T CODE § 53760.3(*o* ).

As a factual matter, this court is persuaded by a preponderance of evidence that neither National Public Finance nor Assured Guaranty negotiated in good faith during the California neutral evaluation process. Rather, they took the position that there was nothing to talk about unless the City also proposed to impair a different creditor, which the City declined to do.

■ The objectors, having adopted the posture of a stone wall by refusing seriously to negotiate, will not now be heard to complain about the negotiating behavior of their counterparty.

While this court understands that a principled impasse may underlie the objectors' stone wall, the existence of impasse does not necessarily undermine the City's compliance with the good faith negotiation requirement of the California neutral evaluation process.

The City's dire financial circumstances must have been apparent to the objectors by the time of the trial on the question of the order for relief. Even they conceded on the record that long-term structural budget imbalances exist that require radical surgery; this position also impeaches their contention, to be addressed later, that the City is not insolvent. Their complaint that the City should be more aggressively attacking its pensioners by way of CalPERS is a matter that relates to the structure of a confirmable plan, but that is not relevant to the order for relief.

Although the CalPERS issue will become an important question if the objectors raise it in a challenge to confirmation of a plan of adjustment, their dissatisfaction with the City's proposed manner of dealing with another creditor is not rele-

vant to the order for relief. Rather, its use at this stage is a mere pretext that is not a responsible litigation position.

### 3

There is an adequate, independent reason for rejecting the objectors' challenge to the City's compliance with the California neutral evaluation gateway: the objectors declined to pay their share of costs of the California neutral evaluation process.

California requires that the local public entity pay half of the costs of neutral evaluation, including, but not limited to, the fees of the evaluator, and that the creditors must pay the balance, unless otherwise agreed to by the parties. CAL. GOV'T CODE § 53760.3(s).[15] The City did not agree otherwise.

None of the objectors paid any part of the costs of neutral evaluation as required by § 53760.3(s). National Public Finance was refreshingly candid when it wrote that it would participate in the neutral evaluation but that: "National expressly disclaims any obligation or liability for the payment of any costs or expenses under Section 53760.3(s) of the Act." Although the other objectors were not so candid, they all concede that none of them paid any portion of their § 53760.3(s) obligation. This evidences a pattern of conscious parallelism.

■ Nor is it an excuse that boilerplate provisions in the bond indenture contracts purport to saddle the City with the objectors' legal expenses incurred in this chapter 9 battle. The specificity of the language of California's Government Code § 53760.3(s) indicates a public policy decision by the California legislature to trump

---

**15.** The precise allocation of costs is:
 (s) The local public entity shall pay 50 percent of the costs of neutral evaluation, including, but not limited to, the fees of the

evaluator, and the creditors shall pay the balance, unless otherwise agreed to by the parties.
CAL. GOV'T CODE § 53760.3(s).

contractual fee-shifting provisions in order to promote incentives to negotiate.

The mentality of the macho manager that authorizes uneconomic litigation activity on the premise that the opponent will pay the bills, which is the dysfunctional contractual corollary of the so-called "American Rule" regarding fees that escalates legal expense, has been rejected as a matter of California law in the difficult arena of municipal insolvency.

In other words, the decisionmakers for the capital markets creditors need to check their testosterone at the door, stop assuming that they are spending their opponent's money when they direct their counsel to pursue wasteful legal tasks, and make their litigation business decisions on the premise that they will be responsible for every dollar of legal effort that they order. This merely reflects that basic management principle that authority should not be separated from responsibility.

Here, the objectors are not only pursuing a wasteful strategy, they put themselves in the position of freeloaders who, as a matter of California law, will not be heard to complain about the City's performance of its obligations during the California neutral evaluation process. They should not expect that they can add their legal fees to the debt owed by the City.

Arguably, the City being the prevailing party in the order-for-relief dispute, the objectors could be obliged to pay the City's expenses of litigating the order for relief. Cal. Civ.Code § 1717. That question, however, can be left to another day.

**16.** The precise definition of a municipal "insolvent" is:

(C) with reference to a municipality, financial condition such that the municipality is—

### D

In short, the court is persuaded that the City has proved by a preponderance of evidence that it honored the requirements of the California neutral evaluation process and, in consequence, is authorized by California law to be a chapter 9 debtor. 11 U.S.C. § 109(c)(2).

Independently, as the objectors did not comply with their obligations under California law to negotiate in good faith and to pay their allotted share of the neutral evaluation process, they waived the right to complain about the City's performance during the California pre-filing negotiation process.

### III

The third essential element for eligibility to be a chapter 9 debtor is that the municipality must be insolvent. 11 U.S.C. § 109(c)(3).

A municipality is "insolvent" for purposes of § 109(c)(3) if it either is generally not paying its debts that are not the subject of a bona fide dispute or is unable to pay its debts as they become due. 11 U.S.C. § 101(32)(c).[16]

The City relies on the second prong of the municipal insolvency definition. It contends that, per § 101(32)(C)(ii), as of the filing of its chapter 9 case on June 28, 2012, it was "unable to pay" its debts as they became due. The objectors contend that the City either was not insolvent or manipulated itself into a technical insolvency that should be disregarded.

This trier of fact is persuaded that, by all relevant measures, the City is insolvent.

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or
(ii) unable to pay its debts as they become due.
11 U.S.C. § 101(32).

## A

Three types of insolvency inform the § 109(c)(3) analysis: cash insolvency; budget insolvency; and service delivery insolvency.

■ The theme underlying the two alternative definitions of municipal insolvency in § 101(32)(C) is that a municipality must be in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts. The insolvency must be real and not transitory. This follows from the language of § 101(32)(C) and from other uses of insolvency in the Bankruptcy Code.

### 1

Insight into the meaning of the special definition of "insolvent" for municipalities gains texture by comparison with other forms of the term "insolvent" in the Bankruptcy Code.

The primary use of "insolvent" in other chapters of the Bankruptcy Code refers to what is commonly described as "balance-sheet insolvency," which is a financial condition such that liabilities exceed assets. *See, e.g.,* 11 U.S.C. § 548(a)(1)(B).

In addition, for those involuntary bankruptcy cases that are premised on financial condition,[17] the requirement for an order for relief is that the debtor is "generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h)(1). While § 303 does not actually use the term "insolvent," the language of § 303(h)(1) focused on debts as they become due is the same as the debts-as-they-become-due language in the definition of municipal insolvency. § 101(32)(C).

### 2

■ The language "unable to pay as they become due" in the municipal insolvency definition implicates the notions of time and projections about the future.

Statutory construction rules likewise point to a temporal aspect as the § 101(32)(C)(ii) phrase "as they become due" must mean something different than its § 101(32)(C)(i) partner "generally not paying its debts." *In re City of Bridgeport,* 129 B.R. 332, 334–37 (Bankr.D.Conn. 1991).

The consequence of the § 101(32)(C)(ii) temporal definition of insolvency is that a municipality need not be actually out of cash before it is cash insolvent.

But how far one looks into the future to discern insolvency has not been settled. Although the *Bridgeport* court purported to announce a rule that limited the analysis to the current and the next succeeding fiscal years, the putative rule in that decision reflects the unpersuasive state of the evidence before the court in that case, which it viewed as too speculative to be reliable. *Bridgeport,* 129 B.R. at 337–38. The *Bridgeport* rule does not purport to be a rule for all cases.

In this instance, as the City would run out of cash within a matter of weeks after the case was filed, it is only necessary to posit for future situations that § 101(32)(C)(ii) potentially permits the actual point of running out of cash to be after the next succeeding fiscal year.

### B

The evidence establishes that as of February 28, 2012, the City was not able to pay its debts as they became due and remained cash insolvent through the date

---

**17.** Control of the debtor's property in some circumstances may warrant an involuntary order for relief, independent of the debtor's financial condition. 11 U.S.C. § 303(h)(2).

of filing the chapter 9 case on June 28, 2012.

1

■ As of February 28, 2012, little guesswork was needed to project insufficient cash to complete the current fiscal year. Although cash insolvency probably existed before February 28, it was by then beyond cavil that the City was insolvent for purposes of § 101(32)(C).

The main reason that there was about $1.3 million on hand when the case was filed on June 28, 2012, was that the City had, by virtue of its February 28 decision, intentionally defaulted on $2,048,658 in bond payments due to the objectors before June 30, 2012. It suspended general fund payments on the 2004 Lease Revenue Bond (Parking), the 2009 Lease Revenue Bonds (Public Facilities Fees), and the 2007 Variable Rate Bonds (City Hall).

For the fiscal year scheduled to begin July 1, 2012, the City was unable to project a balanced budget in compliance with California law. Rather, it projected a deficit for the fiscal year commencing July 1, 2012, ranging from $20,207,540 to $38,182,873. Nor would the funds on hand, together with those anticipated to be received during July, be sufficient for payments required to be made during July. Succeeding months looked similarly bleak. General fund payments scheduled to service were projected to total $11,787,182.

By filing the chapter 9 case, the City was able to impose its so-called "pendency plan" according to which, among other things, it unilaterally slashed health care benefits for employees and its 2,400 retirees and suspended general fund payments on bonds. The pendency plan reductions, the ultimate effectiveness of which depends upon confirmation of a plan of adjustment that discharges the breached obligations, *Stockton II*, 478 B.R. at 24–25, enabled the City to adopt a balanced bud-

get. The February 28 projections that led the City to initiate the California neutral evaluation process also sufficed to establish the requisite cash insolvency to file a chapter 9 case.

But, even if the projections of February 28 did not suffice to support a conclusion of cash insolvency per § 101(32)(C), the inability to formulate a balanced budget for the fiscal year beginning July 1 without impairing contractual obligations independently supports the finding of insolvency.

■ In other words, when a municipality lacks the funds to pay its contractual obligations within the current or the next succeeding fiscal year, it is unable to pay its debts as they become due within the meaning of § 101(32)(C).

2

The objectors contend that the City's insolvency was engineered and not genuine. This is where concepts of service delivery insolvency and budget insolvency become relevant.

■ While cash insolvency—the opposite of paying debts as they become due— is the controlling chapter 9 criterion under § 101(32)(C), longer-term budget imbalances (budget insolvency) and the degree of inability to fund essential government services (service delivery insolvency) also inform the trier of fact's assessment of the relative degree and likely duration of cash insolvency.

a

Service delivery insolvency focuses on the municipality's ability to pay for all the costs of providing services at the level and quality that are required for the health, safety, and welfare of the community.

The evidence demonstrates that the police department has been decimated. The

crime rate has soared. Homicides are at record levels. The City has among the ten highest rates in the nation of aggravated assaults with a firearm. Police often respond only to crimes-in-progress.

That is a paradigm example of service delivery insolvency that confirms that the cash insolvency is no chimera.

### b

Budget insolvency focuses on the ability of a municipality to create a balanced budget that provides sufficient revenues to pay for its expenses that occur within the budgeted period. Relevant budgeted periods include future fiscal years. The projections in the February 28 memorandum, which are not contested by the objectors, demonstrate imbalances that would persist for decades without some radical surgery.

Nor do there appear to be untapped resources that would make a material difference. Few fixed assets are available to be sold or otherwise monetized. Sales tax revenues from an improving regional economy will not suffice because, first, the City's insolvency is more profound and, second, it is too speculative to assume that such revenues will rise at the same or greater rate as the regional economy in light of the City's service delivery insolvency.

Nor will normal property tax revenues improve enough to make a material difference. California property taxes are asymmetric: elastic on the downside because it is comparatively easy to obtain reductions in assessments; but inelastic on the upside because increases in assessments and ad valorem rates are restricted by the barriers erected by the famous Proposition 13.

It follows that the extra revenues needed to fund a plan of arrangement probably will have to come from tax increases. The difficulty is that local tax increases in California generally require a vote of the people.

The objectors' assertion that relief should be rejected because the City did not go to the people for a tax increase before filing a chapter 9 case is not persuasive. Evidence that a majority of local tax measures on the November 2012 ballot in California were passed is not probative of, and does not warrant, a conclusion that Stockton voters would have approved a tax increase. The objectors did not point to a single local measure that was enacted amidst fiscal chaos.

To the contrary, Deis testified credibly that a key lesson learned from his long-term career in California local public administration is that successful local tax measures for general-purpose revenues occur in an atmosphere in which the predicate message is that the fiscal house is already in order. Putting the fiscal house in order so that voters might be willing to entertain tax increases is the whole point of chapter 9.

To that end, the chapter 9 plan confirmation standards incorporate the potential need for voter approval. A plan cannot be confirmed unless "electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." 11 U.S.C. § 943(b)(6).

Through that process, a budget can be returned to solvency with a combination of debt adjustment and revenue enhancement, as appropriate to the particular situation.

### 3

The sum of the evidence establishes that the City was insolvent by all available measures when it filed its chapter 9 case. It was cash insolvent, unable to pay its debts as they came due as required by

§ 101(32)(C) and § 109(c)(3). That it was service delivery insolvent confirms that the cash insolvency was not a mere technical insolvency. That it was budget insolvent for the long term confirms that the insolvency would persist without realignment of revenues and expenses. Hence, the City satisfied the insolvency requirement of § 109(c)(3).

### IV

The fourth essential element for chapter 9 eligibility of an insolvent municipality that is authorized under state law to be a chapter 9 debtor is that it "desires to effect a plan to adjust such debts." 11 U.S.C. § 109(c)(4).

■ The cases equate "desire" with "intent" and make clear that this element is highly subjective. *E.g., In re City of Vallejo,* 408 B.R. 280, 295 (9th Cir. BAP2009).

### A

■ At the first level, the question is whether the chapter 9 case was filed for some ulterior motive, such as to buy time or evade creditors, rather than to restructure the City's finances. *Vallejo,* 408 B.R. at 295; 2 Collier on Bankruptcy ¶ 109.04[3][d], at p. 109–32 (Henry J. Sommer & Alan N. Resnick eds. 16th ed. 2011) (hereafter "Collier").

■ Evidence probative of intent includes attempts to resolve claims, submitting a draft plan, and other circumstantial evidence. *Vallejo,* 408 B.R. at 295.

■ In this instance, the City has engaged in extensive efforts to resolve claims. One of the byproducts of the California neutral evaluation process is evidence regarding efforts to resolve claims.

The City's Ask that was used as a basis for discussion during the prefiling discussion also functions as a draft plan for purposes of § 109(c)(4).

And there is powerful circumstantial evidence of the City's desire to effect a plan. Evidence of intent to effect a plan includes the circumstance of the inability to fashion a balanced budget for the impending fiscal year without unilaterally imposing a pendency plan impairing contracts. The City's unilateral reductions at to the outset of the case created an imperative on the City either to have those contract impairments excused by way of a bankruptcy discharge or to achieve agreement with the affected parties.

The City's unilateral cut of retiree health benefits that this court declined to prevent in the *Stockton II* decision echoes the action of the general who burns bridges behind his own troops to leave them with no choice but to attack. Slashing retiree health benefits at the outset of the chapter 9 case left the City with little choice but to effect a plan unless the retirees were to agree to the impairment of their claimed contract rights. Without such agreement or a confirmed plan validating the unilateral action, the impaired rights could spring back into existence in a manner that could be unfortunate for the City.

### B

■ The § 109(c)(4) statutory phrase "desires to effect a plan to adjust such debts" does not necessarily require that a confirmed or confirmable chapter 9 plan be actually intended. The phrase also subsumes a de facto plan in which a sufficient number of affected parties voluntarily revise their contracts with the municipality in the face of the alternative of the potential compulsion of a confirmed plan of adjustment.

At first blush, chapter 9 has only two exits: confirmed plan with attendant dis-

charge or dismissal with no discharge. But there really are three possible chapter 9 outcomes because dismissal subdivides into two alternatives. First, a dismissal in which a sufficient number of affected parties voluntarily agree to modify their rights that the municipality does not actually need a confirmed plan operates as a de facto plan.

Indeed, a de facto plan attendant to dismissal was the recent resolution in this judicial district of the chapter 9 case of the Town of Mammoth Lakes. That case was dismissed without discharge concurrent with agreement among the key parties in interest to a series of contracts that resolved the town's financial difficulties, the muscle of chapter 9 having been what forced everyone to take seriously the need to bargain. Order Dismissing Case, *In re Town of Mammoth Lakes,* No. 12–32463, Bankr.E.D.Cal., Nov. 16, 2012.

While the first form of dismissal without a discharge—dismissal attendant to de facto plan that resolves the financial problem—is a chapter 9 success, the second form of dismissal without discharge bodes trouble.

If the City's case were to be dismissed without a sufficient number of agreements to restore its fiscal health, then even more financial trouble would be in store. One of the consequences of such a dismissal of this case would be revival of the retirees' claims that their health benefits are contracts to be enforced, leaving the City exposed to demands for restoration of those benefits and claims for damages. 11 U.S.C. § 349, *incorporated by id.* § 901(a). In other words, when the City implemented unilateral cost-cutting measures at the outset of this case, it committed itself to the goal of either confirming a chapter 9 plan or achieving agreements sufficient to constitute a de facto plan with respect to the victims of those measures. Any other outcome would be troublesome for the City.

Thus, the court is persuaded by a preponderance of the evidence that the City "desires to effect a plan to adjust such debts" within the meaning of § 109(c)(4) and, in view of its unilateral contract impairments imposed by way of its pendency plan, has little choice but to effect a plan.

## V

The fifth essential element for chapter 9 eligibility has four alternatives, three of which are focused on negotiations with creditors. 11 U.S.C. § 109(c)(5).

The first and fourth alternatives do not apply in this case. The City has not obtained the agreement of a majority in amount of each class of claims that it intends to impair under a plan. 11 U.S.C. § 109(c)(5)(A). Nor is there any suggestion that there was a creditor who was attempting to obtain a preference that would be avoidable under the bankruptcy avoidable preference statute. 11 U.S.C. § 109(c)(5)(D). The second and third alternatives do apply.

The City contends that it has negotiated in good faith with creditors and has failed to obtain agreement of creditors holding at least a majority in amount of each class of claims that it intends to impair under a plan. 11 U.S.C. § 109(c)(5)(B).

And, it contends that negotiation is impracticable with others, including its 2,400 retirees. 11 U.S.C. § 109(c)(5)(C).

### A

The § 109(c)(5)(B) negotiations with each class that the City would impair under a plan puts the focus on organized labor and on the capital markets creditors.

As to labor, the court concludes for purposes of eligibility that the City negotiated

in good faith with its unions. During the pre-filing neutral evaluation process, extensive discussions with the various unions have been documented and were followed by agreements to modify all unexpired collective bargaining agreements before the case was filed. In addition, substantial progress was made towards agreement with the police regarding replacement of their expired collective bargaining agreement. Recalling that personnel costs comprise more than two-thirds of the City's expenses, this is persuasive evidence of negotiation in good faith with a substantial body of creditors.

The objecting capital markets creditors contend that the City did not similarly negotiate in good faith with them. Although they brand the City's proposal as a take-it-or-leave-it ultimatum that was not made in good faith, the exchange of salvos in the good faith barrage and counter-barrage leave the capital markets creditors in the weaker position.

The evidence is that the objecting capital markets creditors, led by Assured Guaranty and National Public Finance, chose to take a we-have-nothing-to-talk-about position once the City indicated that it was not proposing to impair its obligations to CalPERS. In other words, the objecting creditors created a dynamic in which they categorically would not talk about modifying their rights unless and until the City attacked CalPERS. At trial, they expressly asserted that § 109(c)(5)(B) good faith is a one-way obligation applicable to the City but *not* to the objectors themselves.

 The objectors' salvos are off-target. Just as it takes two dancers to tango, good faith negotiations contemplate reciprocity. It is not possible to negotiate with a stone wall. It follows that, as a matter of law, a municipality's § 109(c)(5)(B) good faith negotiation obligation is satisfied with respect to any class of putatively impaired creditors that declines to respond in good faith to a good faith proposal by the municipality.

Although the objectors' complain that the City did not make a good faith proposal, that salvo also misses the target. This court is persuaded, as a matter of fact, that the City's Ask with respect to the capital markets creditors was made in good faith. The court is also persuaded, as a matter of fact, that the City did not adopt a take-it-or-leave-it posture. Rather, the proposals it set forth in the Ask were within the range of reasonable starting positions in a negotiation of plan treatment.

A fair reading of the City's proposals indicates that restoring the foundation of the City's financial structure, and especially reinvigorating its general fund, will necessitate substantial debt relief for up to a decade. One facet of its proposal is a five-year holiday on paying interest and a ten-year holiday on paying principal. Another facet is eliminating the guaranty of general fund assets to back up revenue shortfalls in bonds related to specific projects. The City was willing to pay for both types of accommodation-typically in the form of extended time for payment, increased interest, or other adjustments yielding an appropriate value to the impaired party. In short, the City was making a conventional proposal about which there was much that could have been the basis for bargaining if only the capital markets creditors had been willing to talk.

It follows that the City performed its good faith obligation in the negotiations with labor and with the objecting creditors. The fact that the objectors chose not to reciprocate does not count against the eligibility of the City under § 109(c)(5)(B).

## B

Impracticability of negotiations per § 109(c)(5)(C) is also pertinent to the City's eligibility in two respects.

First, it is impracticable to negotiate with 2,400 retirees for whom there is no natural representative capable of bargaining on their behalf. A retiree committee to speak on behalf of the retirees can be appointed by the United States trustee, but only after entry of the order for relief. 11 U.S.C. § 1102, *incorporated by* § 901(a).

Second, § 109(c)(5)(C) impracticability provides an adequate, independent reason for concluding that the City has satisfied the fifth essential element for eligibility to be a chapter 9 debtor with respect to the objecting capital markets creditors—it is impracticable to negotiate with a stone wall.

## VI

The sixth preliminary to entry of an order for chapter 9 relief is a wild card that comes in through the back door. Even if a municipality satisfies the eligibility requirements of § 109(c), the court "may" dismiss the petition "if the debtor did not file the petition in good faith." 11 U.S.C. § 921(c).

This is another of four encounters with the concept of "good faith" in chapter 9. As already explained, there is a reciprocal duty to participate in good faith in California's gateway neutral evaluation process. Cal. Gov't Code § 53760.3(*o*). Chapter 9 eligibility contemplates good faith negotiation with impaired classes that are willing to negotiate. 11 U.S.C. § 109(c)(5)(B). Nor can a plan of adjustment be confirmed unless proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3), *incorporated by* § 901(a).

## A

Section 921(c) "good faith" serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code. It is assessed on a case-by-case basis in light of all the facts, which must be balanced against the broad remedial purpose of chapter 9. 2 Collier at 1921.04[2]. Indeed, if all of the eligibility criteria set forth in § 109(c) as described above are satisfied, it follows that there should be a strong presumption in favor of chapter 9 relief.

Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's prepetition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief. 2 Collier ¶ 921.04[2].

## B

Since neither the statute nor the cases are explicit about the burden of proof regarding § 921(c) good faith, it is appropriate to address the question through the matrix of trial procedure and the law of evidence.

Although it is straightforward that the § 109(c) eligibility elements are matters as to which the City has the affirmative burden to establish in all respects by preponderance of evidence, the structure of the language of § 921(c)—"if the debtor did not file the petition in good faith"—presents a significant difference that implicates the distinction between the burden of going forward and the burden of persuasion.

■■ The use in § 921(c) of the conditional "if the debtor did not," when contrasted against the background of the direct language of § 109(c), means that the City's proof of the § 109(c) elements also operates to create a rebuttable presumption that it filed the case in good faith for purposes of § 921(c).

This presumption of § 921(c) good faith is directed against the objectors, who thereby have the burden of producing evidence to rebut the presumption. Fed. R.Evid. 301.[18]

If the objectors produce evidence' to rebut the § 921(c) good faith presumption, then the City must proceed to carry its ultimate burden of persuasion. Fed. R.Evid. 301.

The quantum of evidence that must be produced to rebut the § 921(c) good faith presumption is appropriately evaluated in light of, first, the policy favoring the remedial purpose of chapter 9 for those entities that meet the eligibility requirements of § 109(c) and, second, the risk that City residents will be prejudiced if relief nevertheless is denied.

■■ In view of the multi-year effort to ratchet down expenses during which the City reduced employees and reduced employee compensation, its cash insolvency, its service insolvency, its good faith negotiations or efforts to negotiate with creditors, and its inability to achieve significant further reductions without being able to compel the impairment of contracts, the § 921(c) good faith presumption in this instance is strong.

The objectors' burden of going forward to produce evidence to call into question

§ 921(c) good faith has not, in the judgment of this trier of fact, been satisfied. The objectors have not, by a wide margin, adduced evidence sufficient to rebut the presumption that the case was filed in good faith.

The presumption that the case was filed in good faith not having been rebutted, it follows that the City satisfied its burden to persuade this trier of fact that it filed the case in good faith for purposes of § 921(c).

## VII

Assured Guaranty made a timely motion for amended findings under Federal Rule of Civil Procedure 52(b) questioning the findings regarding its lack of good faith. Fed.R.Civ.P. 52(b), *incorporated by* Fed. R. Bankr.P. 7052 & 9014. The effect of this timely motion is to defer the deadline for appeal from the order for relief until after this court disposes of the motion. Fed. R. Bankr.P. 8002(b).

It is contended that the evidence does not support a finding that Assured Guaranty did not negotiate in good faith, first, by voting with its feet and acting as a stone wall in dealings with the City and, second, by not paying its share of the California neutral evaluation fees. The City has countered that the findings are based on evidence in the record and reasonable inferences drawn therefrom.

The gist of the motion is that the court is unfairly holding Assured Guaranty accountable for the actions of National Public Finance of entering the neutral evaluation process with a renunciation of its obligation under California Government Code § 53760.3(s) to pay a portion of the

---

18. Federal Rule of Evidence 301 provides:
In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally. Fed.R.Evid. 301.

neutral evaluation fees and for announcing to the neutral evaluator that there was nothing to discuss so long as the City was declining to propose impairment of its obligations to CalPERS.

After careful reflection, this trial court is persuaded that its original findings are correct.

### A

The premise of the Assured Guaranty motion is that the court disregarded the direct evidence embodied in the declaration of Assured counsel that was designed to explain and excuse the negotiating conduct of Assured.

### 1

This requires clarity about the role of the trial court when, as here, it acts as finder of fact without a jury.

The basic role of the fact finder is to determine credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. Fed. R.Civ.P. 52(a), *incorporated by* Fed. R. Bankr.P. 7052 & 9014; *cf., e.g., United States v. Hubbard,* 96 F.3d 1223, 1226 (9th Cir.1996).

Findings will not be set aside by an appellate court unless clearly erroneous, with deference given to the trial court's opportunity to judge witness credibility. Fed.R.Civ.P. 52(a)(6), *incorporated by* Fed. R. Bankr.P. 7052 & 9014.[19]

As part of that process, the trier of fact is entitled to ascribe differing weights to admitted evidence. The trier of fact is also entitled to disbelieve admitted evidence. Professor McCormack explains in a passage invoked by Assured Guaranty that direct evidence "is evidence which, *if believed,* resolves a matter in issue." McCormack on Evidence § 185 (emphasis supplied); Reply of Assured Guaranty Corp. & Assured Guaranty Municipal Corp. to City of Stockton's Opposition to Motion Pursuant to Rule 52(b), at 4.

The authority of the trier of fact to believe or disbelieve and to ascribe weight to evidence looms large in this motion.

### 2

The focus is on the Bjork declaration that was admitted into evidence. It is contended that this constitutes unrebutted evidence of Assured Guaranty's good faith conduct.

First, as a basic matter of trial evidence, this written declaration that was admitted into evidence by stipulation of the parties is merely testimony that this court, in its capacity as trier of fact, is entitled to believe or to disbelieve regardless of whether there is cross-examination or other forms of rebuttal.

This trier of fact does not give much weight to the Bjork declaration for two distinct reasons. First, there is the structural problem that Mr. Bjork is a lawyer who represents one of the objectors. Indeed, he is an excellent lawyer who can be counted on to be careful to say nothing that might undermine his client. Such testimony, especially written testimony presented by agreement without cross-examination, is not likely to be fully candid and complete.[20] In the judgment of this

---

19. The rule provides:

 (a)(6). Setting Aside the Findings. Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.

 Fed.R.Civ.P. 52(a)(6), *incorporated by* Fed. R. Bankr.P. 7052 & 9014.

20. Nor can the Bjork declaration be regarded as uncontested. The assertion that the City's counsel provided a responsive declaration that acknowledged that the Bjork declaration was "largely accurate" does not lead to a

trier of fact, it came with too much spin to be taken at face value.

The second reason for not giving much weight to the Bjork declaration is that it is inconsistent with the obstinate stance the objectors, including Assured Guaranty, have taken in this case. The objectors' continued resistance to an order for relief and insistence on a trial in the face of overwhelming financial evidence of insolvency that was developed before trial defies common sense. As trial approached, they must have recognized that the evidence would compel the conclusion that the City is in desperate financial straits that likely could only be solved by impairing contracts through the chapter 9 process that follows after entry of an order for relief.

Nor is the obstinance about an order for relief consistent with their posture regarding CalPERS. It has long been evident that the objectors are itching for a fight over pensions, to answer interesting questions whether the City has an executory contract with CalPERS and whether liabilities to CalPERS might be dischargeable debts. And CalPERS itself has been bellowing and pawing the sidelines during the eligibility phase waiting for the main event that will come only after relief is ordered.

In this context, the assertion by the City's counsel that the objectors' obstinacy actually is "all about leverage" resonates. The objectors are trying to get their way by forcing the City to incur massive legal expenses that should not be necessary. An appropriate method for achieving their goal of spreading the pain to CalPERS would be to challenge CalPERS head-on in battle over an actual plan filed after relief

is ordered, in which battle the City could watch from the sidelines.

This trier of fact is persuaded that the carefully-drawn declaration of a lawyer, and by a lawyer, and for a client reflects a party in interest going through the motions without sincerely intending to achieve a legitimate litigation goal.

2

The picture that emerged at trial at which Assured Guaranty and National Public Finance shared the lead in contesting the order for relief was a picture of a group of similarly situated creditors that had been marching in lockstep throughout the case. Although there is nothing improper about related litigants presenting a united front, each participant assumes the risk of being tainted by one of its associates.

National Public Finance may have been the one who was so bold as to put in writing its defiance of the cost-sharing obligation imposed by California Government Code § 53760.3(s). But Assured Guaranty made no effort to disagree and concedes that it paid nothing. The parallelism is eloquent.

██ Assured Guaranty protests that the City did not ask it to pay any portion of the Government Code § 53760.3(s) obligation. But the obligation is not an obligation to reimburse the City; rather, it is a direct obligation imposed on parties in interest that the California legislature intended to be self-executing. Assured Guaranty was obliged to be proactive about the bill.

Assured Guaranty protests that pre-existing agreements in its contracts with the City obliged the City to pay the Assured

different conclusion. Mr. Levinson, like Mr. Bjork, is an excellent lawyer who can be counted on to be careful to say nothing that might undermine his client. The word

"largely" leaves room for a great deal of disagreement about what was and was not accurate and complete in the Bjork declaration.

Guaranty portion of the neutral evaluation obligation and that this satisfies the "unless otherwise agreed by the parties" clause of Government Code § 53760.3(s). As explained above, this court is not persuaded that a cost-shifting clause in the underlying contract satisfies the "otherwise agreed" clause. Rather, Government Code § 53760.3(s), at a minimum,[21] indicates a public policy decision by the California legislature to trump contractual fee-shifting provisions.

The objectors' trial presentation was a coordinated effort that resembled close order drill. It is apparent that the objectors had been marching together throughout the case. National Public Finance may have been calling cadence, but Assured Guaranty was keeping in step.

In short, the motion to amend the findings pursuant to Federal Rule of Civil Procedure 52(b) will be denied. The court was required at trial to weigh competing evidence, to make credibility determinations, and to draw reasonable inferences. After reflecting on the findings in light of the points raised by Assured Guaranty, it remains confident that all of the questioned findings are correct.

## CONCLUSION

The City having prevailed on its contention that chapter 9 relief is appropriate, a chapter 9 order for relief will be entered.

The motion by Assured Guaranty to alter or amend the court's oral findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(b) will be denied.

Appropriate orders will issue.

---

**21.** As noted above, there is also a theory that the objectors might be required to pay the City's costs of litigating the order for relief because the City was the prevailing party.