FILED

DEC 11 2015

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

ORDERED PUBLISHED

### UNITED STATES BANKRUPTCY APPELLATE PANEL

### OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: ) | BAP No. EC-14-1550-DJuF |
| ) | |
| CITY OF STOCKTON, CALIFORNIA, ) | Bk. No. 12-32118-CMK |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| FRANKLIN HIGH YIELD TAX-FREE ) | |
| INCOME FUND; FRANKLIN ) | |
| CALIFORNIA HIGH YIELD ) | |
| MUNICIPAL FUND, ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | **OPINION** |
| ) | |
| CITY OF STOCKTON, CALIFORNIA, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and submitted on November 19, 2015
at Sacramento, California

Filed - December 11, 2015

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Hon. Christopher M. Klein, Bankruptcy Judge, Presiding

Appearances:     James C. Johnston, Jones Day, appeared and argued
on behalf of Appellants Franklin High Yield Tax-
Free Income Fund and Franklin California High
Yield Municipal Fund.

Marc A. Levinson, Orrick, Herrington & Sutcliffe
LLP, appeared and argued on behalf of the Appellee
City of Stockton, California.

Before:  DUNN, JURY AND FARIS, Bankruptcy Judges.

DUNN, Bankruptcy Judge:

Franklin High Yield Tax-Free Income Fund and Franklin California High Yield Municipal Fund (collectively, "Franklin") appeal the bankruptcy court's order ("Confirmation Order") confirming the City of Stockton, California's ("City") first amended plan of adjustment ("Plan") in chapter 9.[1] We DISMISS, as equitably moot, Franklin's appeal of the Confirmation Order generally and otherwise AFFIRM the Confirmation Order's treatment of Franklin's general unsecured claim under the Plan.

## I. FACTUAL BACKGROUND[2]

A. Events prior to bankruptcy

The financial problems that drove the City to seek chapter 9 relief did not arise overnight. The City was an epicenter of the subprime mortgage default crisis that arose in conjunction with

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2] Historical background facts are taken primarily from the City's modified disclosure statement, filed on November 21, 2013 ("Disclosure Statement"), and the bankruptcy court's published opinion on the City's eligibility for chapter 9 relief in In re City of Stockton, California, 493 B.R. 772 (Bankr. E.D. Cal. 2013). Franklin only included portions of the Disclosure Statement in their excerpts of record. We have exercised our discretion to review the entire Disclosure Statement and certain other documents in the electronic record of the City's main chapter 9 case. See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.), 887 F.2d 955, 957-58 (9th Cir. 1988); Atwood v. Chase Manhattan Mortg. Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

-2-

the recession that began in 2007-08.  During this period, real estate values, both commercial and residential, in the City declined by around 50%, and unemployment grew to about 22%.  The median home price in the City dropped from $397,000 in 2006 to $109,000 in 2012, a decline of 72%.  Disclosure Statement, at 17. The City had one of the highest foreclosure rates in the country. Consequently, property tax, sales tax and other public revenues declined precipitously.

Two self-inflicted factors worked to exacerbate significantly the City's financial problems:  1) As noted by the bankruptcy court,

> In better times, [the City] committed its general fund to back long-term bonds to finance development projects based on an overly-sanguine "if-you-build-it-they-will-come" mentality.  They did not come.  Hence project revenues were insufficient to pay project bills.

City of Stockton, 493 B.R. at 779.

2) In addition, the City had a history of compensating its employees at above-market levels.

> Among other things, the City paid for generous health care benefits to which employees did not contribute, including lifetime health care regardless of length of service.  It permitted, to an unusual degree, so-called "add-pays" for tasks that allowed nominal salaries to be increased to totals greater than those prevailing for other municipalities.  And there were pre-determined automatic annual cost-of-living pay increases not tied to the state of the economy or local finances. . . . Pensions were allowed to be based on the final year of compensation, which compensation could include essentially-unlimited accrued vacation and sick leave.  This led to a phenomenon of so-called "pension-spiking" in which a pension could be substantially greater than the retiree's actual final salary.  Nor were individual employees required to contribute to their pensions.

Id.

The City's financial problems were obscured by faulty

-3-

management and accounting practices. "City accounts were in such disarray that it has taken literally years to unscramble them." Id. However, ultimately, the City's fiscal excesses, particularly in light of the recession, proved unsustainable.

Beginning in 2008, the City declared a series of financial emergencies and took certain unilateral actions to try to get its fiscal house in order. The City reduced its work force "by 25% from 1,886 on July 1, 2008 to 1,420 on December 31, 2011." Id. at 780. "[S]worn police officers were cut by 25%, non-sworn police staffing by 20%, fire staffing by 30%, and non-safety staffing by 43%." Disclosure Statement, at 9. Compensation to City employees was reduced by $52 million, and staffing and service levels were cut by $38 million, "for an overall General Fund budget reduction of approximately $90 million during fiscal years 2009-10, 2010-11, and 2012-13." Id. Unfortunately, these actions were not enough to solve the City's fiscal problems.

As of June 30, 2012, the City's general fund budget for the 2012-13 fiscal year was projected to be $25.9 million under water, with funding potentially not available to cover July 2012 payroll, unless drastic action was taken. Id. Accordingly, the City Manager and Stockton's City Council took steps to initiate the neutral evaluation process under California Government Code ("Cal. Gov. Code") § 53760 as a prelude to a chapter 9 filing. City of Stockton, 493 B.R. at 780-81.

Former bankruptcy judge Ralph Mabey was selected as the neutral evaluator. Thereafter, the neutral evaluation process continued for ninety days, as authorized by Cal. Gov. Code § 53760.3(r), and some positive results were achieved: Agreements

-4-

were negotiated to adjust all unexpired collective bargaining agreements with City employees, and substantial progress was made in negotiations with some other stake holders. Id. at 783. However, no agreements were reached with any capital markets/bond creditors, including Franklin. Id. at 782-83.

B. Chapter 9 filing and events prior to confirmation

The City filed its petition for relief under chapter 9 on June 28, 2012. From the outset, proceedings in the City's bankruptcy case were contentious. The capital markets/bond creditors contested eligibility, and "only after many months of costly discovery, briefing, legal maneuvering, and ultimately a trial" did the bankruptcy court determine that the City was entitled to relief in chapter 9. The order for relief was entered on April 1, 2013, and the bankruptcy court's opinion stating its findings and conclusions as to the City's eligibility for chapter 9 relief was entered on June 12, 2013. See City of Stockton, 493 B.R. 776-98 (Bankr. E.D. Cal. 2013). The bankruptcy court's eligibility decision was not appealed and is final.

In the meantime, the bankruptcy court had appointed Oregon bankruptcy judge Elizabeth L. Perris as mediator on July 12, 2012, and negotiations continued between the City and interested parties under her auspices, with the goal of reaching agreement on the terms for a consensual plan of adjustment. These negotiations were protracted and proceeded in fits and starts, but over time, they were largely successful, with definitive settlements reached with the following creditors and creditor groups:

1) The Stockton Police Officers' Association – the only labor organization with which the City had not reached agreement prepetition;

2) The Official Committee of Retirees – which represented 2,100 retirees with pension benefits, of which approximately 1,100 also claimed rights to lifetime health benefits ("Retiree Health Benefit Claims");

3) California Public Employees' Retirement System ("CalPERS") – which administers the City's pensions;

4) Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured") – which insured the City's pension bonds;

5) National Public Finance Guarantee Corporation ("NPFG") – which insured an aggregate of approximately $93.8 million in 2004 and 2006 City bonds, secured in part by parking structures, among other things.

6) Ambac Assurance Corporation ("Ambac") – which insured approximately $13.3 million in 2003 City certificates of participation; and

7) Wells Fargo Bank ("Wells Fargo") – which served as the indenture trustee for a number of the City's bond issues.

In fact, the only major creditor group with which no settlement was negotiated was Franklin.

C. Plan provisions and confirmation proceedings

The Plan submitted by the City for confirmation classified claims, incorporating the mediated settlements with creditor constituencies, including the following:

1) Claims of CalPERS and pension plan participants (Class 15):

-6-

The claims of pension plan participants and CalPERS were treated as unimpaired because the City settled with them on the basis that it would remain bound to honor their legal, equitable and contract rights unaltered. (The quid pro quo for the City's settlement was that it would be relieved of liability to pay Retiree Health Benefit Claims, except for $5,100,000, to be paid as provided for general unsecured claims in Class 12.)

2) Claims of Assured (Classes 5 and 6): Assured's claims were treated as impaired, entitling Assured to vote both as Class 5 and Class 6. Under the Plan, the City agreed to transfer fee title to its interest in an office building located at 400 E. Main Street in Stockton ("400 E. Main"), its planned replacement for city hall, to Assured in exchange for the extinguishment of the City's obligations under 2007 lease obligation bonds. Lease arrangements with respect to 400 E. Main were to be altered to provide that the City would lease space in 400 E. Main from Assured for eight years at below-market rates, with four one-year options to renew. As part of their settlement, the City and Assured agreed that the City's obligations under pension bonds would be reduced to 52%, but allowed for contingent full repayment of the bond obligations if the City's revenues out-performed certain baseline projections.

3) Claims of NPFG (Classes 2, 3 and 4): NPFG's 2004 parking structure bonds were to be paid through a new Parking Authority, to be created by the City, that would take ownership of all downtown Stockton parking facilities. The payment obligation for the bonds would be shifted from the General Fund to the Parking Authority, removing the obligation from the General Fund ledger.

7

NPFG's 2004 arena-related bonds were secured by both a lease of the arena and a pledge of certain restricted tax revenues. The bonds were to be restructured to provide debt service savings and make it more likely that the restricted tax revenues would be sufficient to service the debt. A ceiling on General Fund liability was negotiated as part of this settlement. Finally, NPFG's 2006 bonds were secured by a lease on the Stewart Eberhardt Building, which houses the City's departments of Human Resources, 911 Dispatch, Police Investigations and Crime Lab, and Public Works. Because the Stewart Eberhardt Building was constructed to meet California's "essential services" building standards, it would be very expensive to replace. Accordingly, the settlement provided that the obligations of the City under NPFG's 2006 bonds would not be altered. NPFG's claims in Classes 2, 3 and 4 were treated as impaired.

4) <u>Claims of Ambac (Classes 1A and 1B)</u>: Ambac's claims were secured by leases of the City's main police station, two fire stations, and a library branch. The Plan did not purport to alter the amounts due to holders of the 2003 City certificates of participation, but the Plan provided for a reduction of the General Fund's liability with respect to Ambac's claims and for future flexibility to extend payments, if necessary, such that Ambac would have rights to vote as "impaired" in both Classes 1A and 1B under the Plan.

5) <u>General Unsecured Claims (Class 12)</u>: Included in class 12 were "Golf Course/Park Unsecured Claim" (Franklin's unsecured claim); Retiree Health Benefit Claims; Leave Buyout Claims; the claim filed by Michael A. Cobb; and miscellaneous Other

8

Postpetition Claims and General Unsecured Claims. The mediated agreement with the Official Committee of Retirees provided that the Retiree Health Benefit Claimants would receive an aggregate payment of $5,100,000 in full satisfaction of their allowed claims. All other creditors in Class 12 would receive a percentage of the allowed amounts of their respective claims equal to the percentage that the Retiree Health Benefit Claimants would recover (based on the $5,100,000 payment).

As noted above, the City did not reach a settlement with Franklin, but the City offered Franklin the opportunity to share pro rata in contingent funds promised to Assured if a deal could be made with respect to treatment of Franklin's claims.

Franklin objected to confirmation of the Plan. Following extensive pre-hearing briefing by the parties, the bankruptcy court conducted a five-day trial of confirmation issues. At the same time, the bankruptcy court heard evidence to determine the amount of Franklin's secured claim in a pending adversary proceeding. The bankruptcy court received and considered multiple post-hearing submissions and heard a day of post-hearing argument.

At a hearing on July 8, 2014, the bankruptcy court announced its findings as to the value of Franklin's collateral, consisting of two golf courses, a community center associated with one of the golf courses, and an ice skating rink. The bankruptcy court found the aggregate value of Franklin's security to be $4,052,000. Franklin has not appealed that finding. Thereafter, the City amended the Plan to provide for treatment of Franklin's secured claim as Class 20, specifying that Franklin's allowed

9

secured claim in the amount of $4,052,000 would be paid in full on the effective date of the Plan.

At a hearing ("Hearing") on October 30, 2014, the bankruptcy court stated orally on the record its findings and conclusions with respect to confirmation of the Plan. The first thing the bankruptcy court did was incorporate the findings and conclusions from its eligibility determination. See City of Stockton, 493 B.R. at 776-98. It noted the outstanding objections to confirmation from Franklin, focusing on Franklin's challenges to the City's good faith in proposing the Plan and its argument that its claim should be separately classified from the general unsecured class. The bankruptcy court further noted that one of the requirements for implementation of the Plan was that the City's voters approve a tax increase to fund Plan obligations, and the City's voters had done so.

The bankruptcy court quoted § 1122(a)'s requirement that, "[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." It then observed that bond claims, other than Franklin's, were all separately classified, "and that's appropriate because each one has its own legal rights and status."

The bankruptcy court noted that § 1123(a)(4) "requires that there be the same treatment of each claim or interest of a particular class unless the holder of a claim or interest agrees to less favorable treatment." It then stated that it had examined the treatment of all of the classes of claims in the Plan, with particular focus on Class 12's treatment of general

10

unsecured claims, and found "there is equal treatment with respect to all of the claims that are general unsecured claims." Accordingly, it concluded that the requirements of § 1123(a)(4) had been satisfied. In addition, later on during the Hearing, the bankruptcy court determined the aggregate amount of the Retiree Health Benefit Claims to be $545 million.

The bankruptcy court further noted § 1129(a)(3)'s requirement that "the Plan must have been proposed in good faith and not by any means forbidden by law." It considered Franklin's objection that it was unfairly discriminatory to treat Franklin's unsecured claim as provided for in Class 12 while not altering the treatment of the City's pension obligations. However, it rejected Franklin's argument.

> The general reduction in compensation has an indirect effect on pensions. The reduction in . . . number of employees has a significant effect to pensions. There are fewer people entitled to pensions in the first place. Also, the City has a plan for new employees in which pensions are less generous than the existing pensions, and those have all been approved and signed off in the collective bargaining agreements.

Hr'g Tr. Oct. 30, 2014, at 35:9-16. In addition, the bankruptcy court pointed out that, "[O]ne of the features of the agreements with other capital market creditors is a contingent fund that is available in a number of years down the Plan that is designed to provide for additional payment if the finances of the City prosper and that . . . more than 20 percent of that was reserved for Franklin Funds if it wished to take advantage of it before the time of confirmation," but Franklin elected not to accept that option. Id. at 36:13-20. Based on those findings, the bankruptcy court concluded that the Plan had been proposed in

11

good faith and not by any means forbidden by law.

The bankruptcy court, after reiterating its understanding that Franklin had challenged the classification of its unsecured claim under the Plan, noted that all impaired classes had voted to accept the Plan, and, thus, the requirements of §§ 1129(a)(8) and 1129(a)(10) were satisfied.[3]

The bankruptcy court then moved on to consider whether the requirements for confirmation of a plan of adjustment in chapter 9 under § 943(b) were satisfied and so found. In particular, it found that "[a]ll amounts to be paid by the debtor or any person for services or expenses in the case or incident to the Plan have been fully disclosed and are reasonable." Accordingly, the requirements of § 943(b)(3) were satisfied.

The bankruptcy court further found that, in light of the City voters' approval of the sales tax increase necessary to fund the Plan, the requirements of § 943(b)(6) were satisfied.

Finally, the bankruptcy court considered § 943(b)(7), which requires that the Plan be in the best interests of creditors and be feasible. It noted that the "best interests" test in chapter 9 is necessarily different from the test in chapter 11, which requires that creditors receive at least as much as they would receive in a chapter 7 liquidation. "[I]t goes without saying

_____

[3] Toward the end of the hearing, counsel for the City pointed out that one impaired class, Class 14, tort claimants against the City, had voted in favor of the Plan in terms of the majority in amount required under the Bankruptcy Code, but not in number. The bankruptcy court did not make further findings with respect to Class 14 at the Hearing, but as no member of Class 14 has appealed the Confirmation Order, we do not consider this matter further.

12

that a municipality cannot be liquidated, so it's kind of hard to figure out what a hypothetical liquidation would be." Hr'g Tr. Oct. 30, 2014, at 40: 20-23.

Having considered carefully the provisions of the Plan and available alternatives, including starting over to construct a new chapter 9 plan at great additional cost, the bankruptcy court found that the Plan was "the best that can be done in terms of the restructuring and adjustments of the debts of the City" and concluded that the requirements of § 943(b)(7) were satisfied. Accordingly, the Plan would be confirmed.

Franklin filed a motion to alter or amend findings of fact and conclusions of law ("Motion to Amend Findings"), arguing that the Retiree Health Benefit Claims should be discounted to present value, which would reduce those claims below the $545 million amount found by the bankruptcy court at the Hearing. The bankruptcy court addressed the Motion to Amend Findings at a hearing on December 10, 2014. It first noted that no objection(s) had been filed to the Retiree Health Benefit Claims, and accordingly, under § 925, they were deemed allowed. It then noted that, even if it discounted the Retiree Health Benefit Claims to present value, the lowest aggregate amount argued for the claims was $261.9 million, as advocated by Franklin, and using that number would not change the Class 12 voting outcome for the Plan.

The bankruptcy court then discussed the parties' presentations as to appropriate discount rates, and after analyzing their presentations and applicable authorities, including § 502, it characterized the Retiree Health Benefit

13

Claims as an entirely unfunded benefit as of the filing date and determined that it was not required to discount the Retiree Health Benefit Claims to present value. Accordingly, the bankruptcy court denied the Motion to Amend Findings.

Franklin filed a notice of appeal and a motion for stay pending appeal ("Stay Motion"). After hearing argument from the parties, the bankruptcy court announced its decision on the Stay Motion at a hearing on January 20, 2015. Noting that the City's chapter 9 case had unfolded over a period of two and a half years, the bankruptcy court went over its rationale for confirming the Plan, enunciated in greater detail in its oral findings and conclusions at the Hearing. It then addressed the standards for the imposition of a stay pending appeal.

In light of the history of the case, the issues raised, and the relatively deferential standard of review as to its fact findings, the bankruptcy court concluded that Franklin's likelihood of success on the merits on appeal was low. Noting that Franklin's counsel stated in argument that "only money" was at issue, and "I'm confident that the City is going to be around, and it's still going to have the citizenry of a couple hundred thousand people," the bankruptcy court did not see how significant or irreparable harm would come to Franklin in the absence of a stay. On the other hand, it found that imposing a stay pending appeal would impose substantial harm on the City and its other creditors, including retirees. Finally,

> there is the public interest. And, of course, municipal insolvency is a very complicated issue of great public interest, and the estate and municipality and just the overall system, capital market system, really are served by some definitive resolution of

14

> cases so that people understand the rules of the game and know exactly what they're facing. . . . [T]he public interest is served by actually being able to implement a plan on which people can rely.

Hr'g Tr. Jan. 20, 2015, at 23:2-8 and 16-18.  Accordingly, the public interest militated against imposing a stay.

Based on these findings and conclusions, the bankruptcy court denied the Motion for Stay.

On February 27, 2015, the bankruptcy court issued an "Amended Opinion Regarding Confirmation and Status of CalPERS" ("Amended Opinion"), supplementing its oral findings and conclusions at the Hearing.  One of the purposes of the Amended Opinion was to clarify the status and amounts of Franklin's secured and unsecured claims:

> Franklin's unsecured claim is $30,480,190.00.  The judicially-determined secured claim is $4,052,000.00, which is being paid in full.  And, Franklin receives $2,071,435.15 from a "Reserve Fund" funded by bond proceeds and held by the indenture trustee under section 5.05 of the bond indenture.  While the parties differ about how to characterize the Reserve Fund, they agree that Franklin ends up with $6,123,435.15 (secured claim + Reserve Fund), plus nearly 1% on its $30,480,190.00 unsecured claim.  Hence, Franklin's total recovery from all sources is about 17.5% (not 12%).

Amended Opinion, at 1 n.1.  Otherwise, the Amended Opinion focused on Franklin's objection argument that the City's pensions could be modified and, in light of that premise, the Plan should not be confirmed if they were not modified –  a premise that the bankruptcy court ultimately rejected.  The bankruptcy court reinforced its findings that City employees and retirees, the beneficiaries of the City's pension plans, "shared the pain" with the capital markets/bond creditors.  It reiterated that the City

15

terminated its lifetime retiree health benefits program through the Plan and that City pension liabilities were indirectly but substantially reduced "as a result of curtailed pay and curtailed future pay increases in the renegotiated collective bargaining agreements." Amended Opinion, at 51. To fund the Plan, City voters "approved a sales tax increase in the greatest amount and for the longest period permitted by California law." Id. at 53. The bankruptcy court restated its conclusions that the standards for confirmation of the Plan in chapter 9 had been met and that the Plan would be confirmed.

On the same day, the bankruptcy court entered the Confirmation Order. Franklin's previously filed notice of appeal is deemed timely under Rule 8002(a)(2).

During the briefing in this appeal, the City filed a motion to dismiss the appeal as equitably moot ("Motion to Dismiss"). Franklin filed an opposition to the Motion to Dismiss, to which the City replied. By order entered on October 14, 2015, the Motion to Dismiss was taken under advisement and referred to this panel for decision in conjunction with its disposition of the appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B) and (L). Except as otherwise stated below, we have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Is this appeal equitably moot insofar as Franklin seeks reversal of confirmation of the Plan?

2. Is it possible to provide a remedy to Franklin in terms

16

of increasing the payout on its unsecured claim under the Plan?

3. Did the bankruptcy court err in concluding that the Plan was "proposed in good faith" for purposes of § 1129(a)(3)?

4. Did the bankruptcy court err in concluding that the classification of Franklin's unsecured claim was not "unfairly discriminatory" for purposes of §§ 1122(a) and 1123(a)(4)?

5. Did the bankruptcy court err in concluding that the Plan satisfied the "best interests of creditors" test in § 943(b)(7)?

6. Did the bankruptcy court err in concluding that it was not required to discount the Retiree Health Benefit Claims to present value?

## IV. STANDARDS OF REVIEW

We review our own jurisdiction, including questions of equitable mootness, de novo. Ellis v. Yu (In re Ellis), 523 B.R. 673, 677 (9th Cir. BAP 2014). We review the bankruptcy court's decision to confirm the Plan for an abuse of discretion. Marshall v. Marshall (In re Marshall), 721 F.3d 1032, 1045 (9th Cir. 2013); Computer Task Group, Inc. v. Brotby (In re Brotby), 303 B.R. 177, 184 (9th Cir. BAP 2003) ("The ultimate decision to confirm a reorganization plan is reviewed for an abuse of discretion."). We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Bronitsky v. Bea (In re Bea), 533 B.R. 283, 285 (9th Cir. BAP 2015). De novo means that we review a matter anew, as if no decision previously had been rendered. Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009).

We must affirm the bankruptcy court's fact findings unless we determine that those findings are "(1) 'illogical,'

17

(2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

A bankruptcy court abuses its discretion if it applies an incorrect legal standard or misapplies the correct legal standard, or if its fact findings are illogical, implausible or not supported by evidence in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

We may affirm the decision of the bankruptcy court on any basis supported by the record. See ASARCO, LLC v. Union Pac. Co., 765 F.3d 999, 1004 (9th Cir. 2014); Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008).

**V.  DISCUSSION**

A.  Equitable mootness

In the Motion to Dismiss, the City argues that we should dismiss Franklin's appeal as equitably moot.  Franklin initially responds that we should not even consider the Motion to Dismiss for two reasons that we address in turn.

1.  Waiver

First, Franklin argues that the City waived its equitable mootness argument because it could and should have raised it earlier.  In support of its argument, it cites familiar authority to the effect that an argument not made in a party's opening brief is deemed waived.  See, e.g., Miller v. Fairchild Indus., Inc., 797 F.2d 727, 738 (9th Cir. 1986) ("The Court of Appeals will not ordinarily consider matters on appeal that are not specifically and distinctly argued in the [party's] opening brief.").

18

The City responds that it properly raised the equitable mootness issue by motion.  See Rule 8013(a)(1) ("A request for an order or other relief is made by filing a motion . . . ."); Ninth Circuit Rule 27-11; Rev Op Group v. ML Manager LLC (In re Mortgages Ltd.) ("Mortgages I"), 771 F.3d 1211, 1214 (9th Cir. 2014) ("ML Manager is also entitled to move to dismiss in this court based on equitable mootness, regardless of the decisions of the courts being reviewed."); Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 879 n.3 (9th Cir. 2012) ("Appellees' contention on equitable mootness is not asserted within its appellate brief, but was the subject of a separate motion to dismiss the appeal as moot . . . .").

Franklin does not argue that it was prejudiced or harmed by the City's raising the equitable mootness issue in the Motion to Dismiss, and we do not perceive any prejudice to Franklin.  As requested in the last section of Franklin's opposition, we are considering the Motion to Dismiss in conjunction with our overall disposition of this appeal.  Franklin and the City both have taken the opportunity for extensive further exposition of their arguments in the papers filed in support of and in opposition to the Motion to Dismiss, thus supplementing the already substantial papering of this appeal through the parties' oversized briefs.  And, even if we believed that the City had waived the issue, we note that equitable mootness raises jurisdictional questions that we have an independent duty to consider sua sponte.  See, e.g., Sahagun v. Landmark Fence Co., Inc. (In re Landmark Fence Co., Inc.), 801 F.3d 1099, 1102 (9th Cir. 2015); Hunt v. Imperial Merchant Servs., Inc., 560 F.3d 1137, 1141 (9th Cir. 2009),

19

quoting <u>Demery v. Arpaio</u>, 378 F.3d 1020, 1025 (9th Cir. 2004).

In these circumstances, we are not persuaded that the City waived equitable mootness as an issue by raising it through the Motion to Dismiss rather than in its answering brief.

2.  <u>Application of equitable mootness in chapter 9</u>

Franklin next argues that the equitable mootness doctrine should not apply to appeals in chapter 9 cases because "[i]n the event of reversal of confirmation, the City always will be able to provide at least some 'fractional' relief without unduly or inequitably impairing the rights of others."  Appellants' Objection to Motion to Dismiss the Appeal as Equitably Moot ("Objection"), at 2.  Thus, Franklin argues that equitable mootness should not apply in chapter 9 appeals **as a matter of law**, supporting its argument with **a fact-based rationale**, and therein lies the rub.

In support of its argument, Franklin cites the opinion of the district court for the Northern District of Alabama on appeal in <u>Bennett v. Jefferson County, Alabama</u>, 518 B.R. 613 (N.D. Al. 2014).  In <u>Jefferson County</u>, the court was concerned that "one of the costs of finality [through application of equitable mootness] is to allow a non-Article III court to decide important constitutional questions that place substantial future obligations on the citizens of Jefferson County without representation."  <u>Id.</u> at 637.  Undercutting its own rationale, the court recognized and agreed "that some part or parts of the Confirmation Order may be impossible to reverse," but it nevertheless concluded that the constitutional issues raised with respect to the county's ceding authority to set sewer rates could

20

not be cut off through the application of equitable mootness. Id. Its ultimate conclusion was, "In light of the public and political interests at stake in any Chapter 9 proceedings, the court will deny the County's appeals to equity to allow allegedly unconstitutional provisions of the Confirmation Order to stand without review." Id. at 638.

The district court for the Eastern District of Michigan came to exactly the opposite conclusion in the appeal in Darrah v. City of Detroit, Michigan (In re City of Detroit, Michigan), 2015 WL 5697779 (E.D. Mich, S.D. Sept. 29, 2015). After surveying the limited applicable authorities, the City of Detroit court concluded:

> [T]he [equitable mootness] doctrine is not concerned with the specific chapter under which the debtor's case was brought. Rather, what matters is whether hearing the bankruptcy appeal could unravel the debtor's plan and disturb the reliance interests created by it. Because the underlying equitable considerations of promoting finality and good faith reliance on a judgment [apply] with equal force to a Chapter 9 bankruptcy appeal, the Court sees no reason why the doctrine should not be applied to avoid disturbing a Chapter 9 plan of adjustment.

Id. at *4. It specifically considered and rejected the conclusion of the Jefferson County court.

> [T]he interests of the City [of Detroit], its over 100,000 creditors, and its nearly 700,000 residents in relying on a final judgment cannot be marginalized and dismissed in the broad brush manner adopted by the Jefferson County court. If the interests of finality and reliance are paramount to a Chapter 11 private business entity with investors, shareholders, and employees, then these interests surely apply with greater force to the City's Chapter 9 Plan, which affects thousands of creditors and residents.

Id. at *5.

This panel and the Ninth Circuit applied equitable mootness

21

in a chapter 9 appeal in <u>Lionel v. City of Vallejo, California</u> <u>(In re City of Vallejo, California)</u>, 551 Fed. Appx. 339 (9th Cir. Dec. 31, 2013).

We are persuaded by the reasoning of the court in <u>City of Detroit</u> that equitable mootness has a legitimate role to play in bankruptcy reorganization cases of all types, chapter 11, chapter 13 **and** chapter 9 and follow the course set in <u>In re City of Vallejo</u>. This appeal arguably presents a paradigm case for considering application of equitable mootness in a chapter 9 context because the constitutional and political concerns that troubled the court in <u>Jefferson County</u> are not present: The City's voters approved the sales tax increase necessary to fund the Plan in advance of confirmation. Those who voted for approval of the tax increase did so in reliance on the City's efforts to confirm the Plan to safeguard the provision of future municipal services. As the bankruptcy court noted in its Amended Opinion:

> By the time the [City's chapter 9] case was filed, the City had been pared down to core functions and [had] been reduced to a situation in which such essential services as police and fire were being operated below sustainable standards. The murder rate had soared. Police responded only to crimes in progress. A wrecker had to accompany fire engines on emergency calls.

Amended Opinion, at 51. Several hundred thousand residents depend on the City to provide future services, including police and fire protection. They have a legitimate concern for finality that is served by appropriate application of equitable mootness. And, we note that Franklin is raising no constitutional issues in this appeal, such as bedeviled the court in <u>Jefferson County</u>. For all of these reasons, we conclude, as a matter of law, that

22

the equitable mootness doctrine can appropriately be applied in chapter 9 cases generally and in this appeal specifically.

3. Standards for application of equitable mootness

Fortunately, in considering the application of equitable mootness, we benefit from the analysis in a number of recent Ninth Circuit decisions. "An appeal is equitably moot if the case presents 'transactions that are so complex or difficult to unwind' that 'debtors, creditors, and third parties are entitled to rely on [the] final bankruptcy court order.'" Mortgages I, 771 F.3d at 1215, quoting In re Thorpe Insulation Co., 677 F.3d at 880. Accordingly, the equitable mootness doctrine focuses on the reliance and finality concerns of interested parties in a bankruptcy appeal, whether participating in the appeal or not.

"Equitable mootness occurs when a 'comprehensive change of circumstances' has occurred so 'as to render it inequitable for this court to consider the merits of the appeal.'" In re Thorpe Insulation Co., 677 F.3d at 880, quoting Trone v. Roberts Farms, Inc. (In re Roberts Farms, Inc.), 652 F.2d 793, 798 (9th Cir. 1981). "Unlike Article III mootness, which causes federal courts to lack jurisdiction and so to have an **inability** to provide relief, equitable mootness is a judge-created doctrine that reflects an **unwillingness** to provide relief." JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props., Inc. (In re Transwest Resort Props., Inc.), 801 F.3d 1161, 1167 (9th Cir. 2015) (emphasis in original).

The Ninth Circuit applies a four-factor test to determine whether an appeal from the order confirming a plan is equitably moot:

23

[1]We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. [2]If a stay was sought and not gained, we then will look at whether substantial consummation of the plan has occurred. [3]Next, we will look to the effect a remedy may have on third parties not before the court. [4]Finally, we will look at whether the bankruptcy court can fashion effective relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

In re Thorpe Insulation Co., 677 F.3d at 881. We examine each of those four factors as follows.

i) Seeking a stay

As noted above, Franklin filed its Stay Motion after the bankruptcy court orally announced its findings and conclusion that the Plan would be confirmed at the Hearing but before the Confirmation Order was entered. The bankruptcy court held a hearing on the Stay Motion and heard argument from counsel for the parties. At a hearing on January 20, 2015, the bankruptcy court stated detailed oral findings on the record addressing the four factors for considering a stay pending appeal as discussed in Nken v. Holder, 556 U.S. 418 (2009), and determined that granting the Stay Motion was not warranted. In its reply in support of the Stay Motion, Franklin conceded that "if no stay is issued, Franklin will not be irreparably harmed." (Emphasis in original.)

Based on this record, whether Franklin has pursued "with diligence all available remedies to obtain a stay" of the Confirmation Order, In re Roberts Farms, Inc., 652 F.2d at 798, is arguable, but at least, Franklin has not "flunked this first step." Id.

24

ii) <u>Substantial consummation of the Plan</u>

Section 1101(2) defines "substantial consummation" as:

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property to be dealt with by the plan; and
(C) commencement of distribution under the plan.[4]

The City argues that there can be no dispute that the Plan has been substantially consummated based on the following actions: 1) The City has paid the $5.1 million required to be paid on Retiree Health Benefit Claims, and all but one of the payment checks had been cashed by retirees. 2) The new lease and assignments between Assured and the City with respect to the 400 E. Main property have been implemented. 3) Agreements and documentation to memorialize the settlements between the City and NPFG have been finalized and signed. 4) The City and Ambac have executed an amended and restated stipulation and settlement agreement. 5) The City executed a new agreement with the California Department of Boating and Waterways. 6) The City executed new agreements with two minor league sports teams. The City asserts that all mandated payments and transactions to implement the Plan have been completed.

In its Objection, Franklin admits that, "The Plan became effective and was consummated in February 2015."

---

[4] Although § 901 does not incorporate § 1101(2) for chapter 9 cases, the definition still is useful in the equitable mootness analysis as no analogous definition is set forth in § 902 "Definitions for this chapter."

iii) The third and fourth factors

"The third consideration in the test for equitable mootness is whether the relief sought would bear unduly on innocent third parties." In re Transwest Resort Props., Inc., 801 F.3d at 1169, citing In re Thorpe Insulation Co., 677 F.3d at 882; and Rev Op Group v. ML Manager LLC (In re Mortgages Ltd.) ("Mortgages II"), 771 F.3d 623, 629 (9th Cir. 2014). In analyzing this factor, we must determine "whether it is possible to [alter the Plan] in a way that does not affect third party interests to such an extent that the change is inequitable." In re Thorpe Insulation Co., 677 F.3d at 882. "The fourth, and most important, consideration . . . is whether the bankruptcy court could fashion equitable relief without completely undoing the plan." In re Transwest Resort Props., Inc., 801 F.3d at 1171. "Where equitable relief, though incomplete, is available, the appeal is not moot." In re Thorpe Insulation Co., 677 F.3d at 883.

The City argues that reversal of the Confirmation Order would undermine the settlements that were so painstakingly negotiated over a period of years with the City's labor unions, CalPERS and the City's pension plan participants and retirees, and the other capital markets/bond creditors, frustrating the expectations of creditor constituencies not participating in this appeal and not before this panel. It further would require revisiting the City's Long Range Financial Plan ("LRFP"), which provided substantial evidence to support the feasibility of the Plan, consequently calling into question the "economic underpinnings of the Plan" and, ultimately, jeopardizing the City's recovery. Motion to Dismiss, at 16. In other words,

26

reversal of the Confirmation Order would unleash chaos before the bankruptcy court and make the process for reconstructing a confirmable plan of adjustment for the City unmanageable.

In its Objection, Franklin assures us that "[t]he relief that Franklin seeks on appeal – greater payment from the City [on its unsecured claim] – would not impact any other constituency." Objection, at 12. "A fundamental premise of this appeal is that the City can pay more to Franklin without altering recoveries of other creditors or otherwise unraveling the Plan." Objection, at 1. We take Franklin at its word.

The Ninth Circuit has repeatedly emphasized that where a creditor is appealing confirmation of a plan, but is seeking "only money" (as in this appeal), it is generally not impossible to provide a remedy. See, e.g., In re Transwest Resort Props., Inc., 801 F.3d at 1173 ("[W]e see no reason why, if the court were to devise a remedy that required Reorganized Debtors to pay Lender one dollar, for example, the plan would be undone."); In re Thorpe Insulation Co., 677 F.3d at 883; Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.), 314 F.3d 1070, 1074 (9th Cir. 2002) ("Even if the plan has been substantially consummated, because Platinum's claim is only for monetary damages against solvent debtors, this is not a case in which it would be impossible to fashion effective relief.").

In its findings in support of its decision to deny the Stay Motion, the bankruptcy court considered what remedies might be available on remand in this case:

> The question is, could an [appropriate] remedy be fashioned that would not require reeling back in, for example, all the payments to retirees, and I have no

27

difficulty perceiving the possibility of any number of likely solutions . . . in the event of a reversal on appeal. Those solutions . . . most certainly would involve more money for Franklin . . . . [W]ith its finances on more stable footing, it's conceivable that some additional funds could be made available to Franklin if the appellate court put the matter back to me, and that could be done without disturbing in any way the payments to retirees; that is, the payments to the other unsecured creditors.

Hr'g Tr. Jan. 20, 2015, at 20:14-18; 21:3-8.

Article XII, Section 3 of the Plan provides that the bankruptcy court retains and has exclusive jurisdiction "to determine any and all . . . contested or litigated matters . . . that are instituted by any holder of a Claim before or after the Effective Date concerning any matter based upon, arising out of, or relating to the Chapter 9 case . . . ." Article XII, Section 8 of the Plan provides that the bankruptcy court retains and has exclusive jurisdiction "to consider any modifications of this Plan . . . ." Article XIV, Section B of the Plan provides:

If any term or provision of this Plan is held by the Bankruptcy Court or any other court having jurisdiction, including on appeal, if applicable, to be invalid, void, or unenforceable, the Bankruptcy Court, in each such case at the election of and with the consent of the City, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

Plan, at 58, 59 and 62. The confirmed Plan gives the bankruptcy court all of the tools it would need on remand to consider a modification to the Plan to increase payments to Franklin on its

28

unsecured claim.

The City argues that those provisions of the confirmed Plan are subject, among other things, to § 904, which provides that, "Notwithstanding any power of the court, unless the debtor [i.e., the City] consents, . . . the court may not, by any stay, order, or decree, in the case or otherwise, interfere with – (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property." In other words, on remand, the bankruptcy court could not order the City to pay any more money to Franklin without the City's consent.

That is a given in light of § 904's requirements. But § 904 applied throughout the process of negotiations between the City and its creditors that resulted in the settlements incorporated in the Plan that required the City to make multi-million dollar payments to its creditors from its revenues. We do not perceive that fundamental statutory limitation as precluding a remand to provide equitable relief in terms of an adjustment of payments to Franklin. The City could consent or not to such an adjustment(s) at various points in further negotiations with Franklin as it determined to be appropriate in the exercise of its sovereign authority.

Based on our review of the record and the Motion to Dismiss, the Objection and the City's reply, we conclude that Franklin attempted to obtain a stay of the Confirmation Order pending appeal, but the Stay Motion was denied, and the Plan has been substantially consummated. To reverse the Confirmation Order at this point would have a potentially devastating impact on

29

creditor constituencies whose settlements with the City were incorporated in the Plan and who are not appearing before us in this appeal. Reversing the Confirmation Order would knock "the props out from under the" Plan and would leave the bankruptcy court with an unmanageable situation on remand. Accordingly, we conclude that Franklin's appeal of the Confirmation Order generally is equitably moot and must be dismissed.

However, we further conclude that to the extent Franklin seeks through its appeal only a greater payment on its unsecured claim, as it concedes in the Objection, an effective remedy is theoretically possible, and that claim is not equitably moot. Accordingly, we will proceed to consider the issues that Franklin raises with respect to the payout on its unsecured claim.[5]

B. The requirement that the Plan be proposed in "good faith"

Section 1129(a)(3), specifically incorporated for chapter 9 cases in § 901(a), requires that a plan of adjustment "has been proposed in good faith and not by any means forbidden by law." A plan is proposed in good faith "where it achieves a result consistent with the objectives and purposes of the [Bankruptcy] Code." In re Sylmar Plaza, L.P., 314 F.3d at 1074, citing Ryan v. Loui (In re Corey), 892 F.2d 829, 835 (9th Cir. 1989); In re

[5] We do not consider Franklin's argument that the bankruptcy court erred in its forward looking interpretation of § 943(b)(3), which provides that "all amounts **to be paid** by the debtor or by any person for services or expenses in the case or incident to the plan have been fully disclosed and are reasonable." (Emphasis added.) That issue has nothing to do with the payment on Franklin's unsecured claim provided for in the Plan.

30

_Madison Hotel Assocs._, 749 F.2d 410, 425 (7th Cir. 1994). Whether the Plan was proposed in good faith is a fact finding in the "totality of the circumstances" reviewed for clear error. _Marshall v. Marshall (In re Marshall)_, 721 F.3d 1032, 1046 (9th Cir. 2013) (citations omitted); _In re Sylmar Plaza, L.P._, 314 F.3d at 1074; _Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)_, 84 B.R. 167, 172 (9th Cir. BAP 1988).

At the outset, the record reflects that the Plan was the product of extended negotiations over a period of years pre- and postpetition resulting in multiple collective bargaining agreements and settlements with creditor constituencies. Franklin objected to confirmation on good faith grounds, arguing that the Plan was not proposed in good faith based on the fact that it was receiving essentially a 1% payout on its unsecured claim when unsecured pension benefit claims were not being altered.

The bankruptcy court began its good faith analysis with its conclusion that Franklin's objection was based on a faulty premise: The Plan had a substantial **indirect** impact on pensions in that 1) employee compensation on which pension benefits were calculated had been reduced; 2) the reductions in numbers of City employees had a significant effect on pensions, as there were "fewer people entitled to pensions in the first place;" and 3) pension benefits for new City employees had been reduced, with those reductions incorporated in the City's collective bargaining agreements.

> [T]he assertion that pensions are not affected by the [Plan] incorrectly suggests that employees and retirees are not sharing the pain with capital markets

31

creditors. To the contrary, the reality is that the value of what employees and retirees lose under the [Plan] is greater than what capital markets creditors lose.

Amended Opinion, at 50. It further took "particular note" of the "obviously intensive arms-length negotiations" that occurred during the case over a period in excess of two years to arrive at material provisions of the Plan and reflected that "significant concessions have been made by virtually all of the various parties in interest, not only on the labor side but also on the capital market side of the equation." Hr'g Tr. Oct. 30, 2014, at 36:1-9.

The bankruptcy court also noted that "one of the features of the agreements with other capital market creditors is a contingent fund that is available in a number of years down the Plan that is designed to provide for additional payment if the finances of the City prosper and . . . more than 20 percent of that was reserved for Franklin Funds if it wished to take advantage of it **before the time of confirmation**. It elected not to do that . . . ." Id. at 36:13-20 (emphasis added). Based on those findings, the bankruptcy court found that the Plan had been proposed in good faith and not by any means forbidden by law.

On appeal, Franklin argues that the treatment of its unsecured claim was unfairly discriminatory, and the City gerrymandered the Class 12 general unsecured class to minimize Franklin's vote against confirmation of the Plan. Section 1122(a) provides that "a plan may place a claim . . . in a particular class only if such claim is substantially similar to the other claims . . . of such class." Franklin's general

32

unsecured claim was placed in the class of general unsecured claims, Class 12, consistent with the plain language of § 1122(a), and the treatment of its claim was the same as the treatment of the claims of all other creditors in Class 12. The Ninth Circuit has concluded that, "[T]he fact that a debtor proposes a plan in which it avails itself of an applicable [Bankruptcy] Code provision does not constitute evidence of bad faith." In re Sylmar Plaza, L.P., 314 F.3d at 1075, quoting In re PPI Enter. (U.S.), Inc., 228 B.R. 339, 347 (Bankr. D. Del. 1998).

Mindful that we must affirm the bankruptcy court's fact findings so long as any support for those findings can be found in inferences that can be drawn from the record, we conclude that the bankruptcy court did not clearly err in its finding that the Plan was proposed in good faith and not by any means forbidden by law.

C.  Classification of claims

As noted above, § 1122(a) provides that claims can only be included in a particular class in a reorganization plan if they are "substantially similar" to the claims of other class members. Section 1123(a)(4) provides that the treatment for each claim in a particular class under a reorganization plan must be the same "unless the holder of a particular . . . claim agrees to a less favorable treatment." As with § 1129(a)(3), § 901(a) specifically incorporates §§ 1122 and 1123(a)(4) for chapter 9 cases. "The bankruptcy court's finding that a claim is or is not substantially similar to other claims, constitutes a finding of fact reviewable under the clearly erroneous standard." Barakat

33

v. Life Ins. Co. (In re Barakat), 99 F.3d 1520, 1523 (9th Cir. 1996), citing Steelcase Inc. v. Johnston (In re Johnston), 21 F.3d 323, 327 (9th Cir. 1994).

Franklin's argument with respect to classification of its unsecured claim starts from the proposition that a plan proponent does not have unfettered discretion to classify similar claims separately, recognizing that equality of treatment among like-situated creditors is one of the primary objectives of the Bankruptcy Code. See Begier v. Internal Revenue Service, 496 U.S. 53, 58 (1990) ("Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property."). Franklin cites to us authorities finding error in the **separate** classification of claims with similar liquidation priorities. See, e.g., In re Barakat, 99 F.3d at 1526; Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1992) ("[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.), 166 B.R. 892, 898 (9th Cir. BAP 1994). However, what Franklin finds objectionable in this case is that its unsecured claim was **not** separately classified but instead was included in a class of general unsecured creditors where it was out-voted.

Contrary to Franklin's argument that the bankruptcy court "disregarded statutory protections" (Appellants' Opening Brief, at 1), the bankruptcy court began its analysis of Franklin's

34

classification issues by quoting the language of § 1122(a). Hr'g Tr. Oct. 30, 2014, at 31:11-13. "Generally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case." In re City of Colo. Springs Spring Creek Gen. Improvement Dist., 187 B.R. 683, 687 (Bankr. D. Colo. 1995).

The bankruptcy court found that the capital markets/bond claims were all separately classified, and "that's appropriate because each one has its own unique legal rights and status." Hr'g Tr. Oct. 30, 2014, at 31:14-15. Franklin characterizes the unsecured claims of other capital markets/bond creditors as "similarly situated" (Appellants' Opening Brief, at 64-65), but its argument glosses over the facts that Assured, NPFG and Ambac all had different collateral securing at least parts of the City's respective obligations to them, and the City ultimately entered into global settlements with all three. "[A]s a general rule each holder of an allowed claim secured by a security interest in specific property of the debtor should be placed in a separate class." 7 Collier on Bankruptcy ¶ 1122.03[3][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). By settling with the capital markets/bond creditors other than Franklin, the City avoided a number of potentially protracted, expensive and risky valuation proceedings with respect to City properties that presented problematic valuation issues, including the Stewart Eberhardt Building, the City's main police station, two fire stations and a library branch. Through a combination of different disposition arrangements for their collateral and different payment terms for the secured and unsecured portions of

35

the City's debts to each bond creditor, including different percentage recoveries, separate classification of the bond creditor claims made legitimate business and economic sense. See In re Barakat, 99 F.3d at 1526. The bankruptcy court did not clearly err in so finding.

The bankruptcy court further found that general unsecured claims, including not only the Retiree Health Benefit Claims and Franklin's unsecured claim but also leave buyout claims, the claim of Michael A. Cobb and other miscellaneous unsecured claims, "were all in the same spot" and were properly included in Class 12.[6] Franklin grudgingly admits that "the Plan's treatment of Class 12 claims superficially is the same [for all class members] – a meager payment of less than one penny on the dollar," but argues that treatment of Retiree Health Benefit Claims under Class 12 cannot be analyzed separately from the treatment of CalPERS and pension plan participants (unimpaired, 100% payment) in Class 15. We disagree for the following

_____

[6] Franklin argues that because its unsecured claim could have been paid "at least in part from restricted PFF's," its unsecured claim is not "substantially similar" to the Retiree Health Benefit Claims for § 1122(a) purposes. "PFF's" are charges levied on new developments to defray a portion of infrastructure expenses. See Cal. Gov't Code §§ 66000 et seq. While the City potentially could have used PFF's to pay debt service to Franklin, it had no **legal** obligation to use PFF's to pay Franklin, which Franklin does not contest. Accordingly, Franklin's citations to Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC), 465 B.R. 525 (9th Cir. BAP 2012) (where the subject creditor had a third party guarantee source of recovery for its unsecured claim), and Steelcase, Inc. v. Johnston (In re Johnston), 140 B.R. 526 (9th Cir. BAP 1992) (where the subject creditor had a secured claim against the assets of another entity to pay its unsecured claim in the debtor's case), are inapposite.

36

reasons.

First, the group of Retiree Health Benefit Claimants and the entire group of the city's pension plan participants are not the same. The 1,100 fully retired City employees with Retiree Health Benefit Claims were represented in the City's chapter 9 case by the Official Committee of Retirees. Current City employees were represented by their respective unions to negotiate or renegotiate collective bargaining agreements. CalPERS administered the City's pension plans. While the interests of all of these parties converged with respect to the treatment of the City's pensions, the group with Retiree Health Benefit Claims in Class 12 was not congruent with the larger group of claimants in Class 15.

Second, while the City's obligations to 1) pay its current employees; 2) provide health care benefits to current and retired employees; and 3) provide pension benefits to its current and retired employees may have arisen under the same contracts, the Plan negotiations dealt with all such issues on related but separate tracks. In considering Franklin's objections to Plan confirmation based on the difference between the treatment of its unsecured claim and the treatment of pension benefits, the bankruptcy court made the following findings:

> I know that in those collective bargaining agreements there were considerable changes and concessions that the unions made regarding compensation and conditions of employment in terms of matters relating to retirement. There was a new retirement plan agreed to for new employees. There was – the employees' portion, the contributions to retirement plans which the City had previously been picking up and paying in excess of six percent, was shifted back to the employees.

Hr'g Tr. Oct. 30, 2014, at 13:18-25.

37

> One of the major financial problems of the City was the Retiree Health Plan. The City's plan beforehand was a "pay as you go" plan, in which the City paid 100 percent of health benefits for retirees and their dependents. This, through the years, started to hemorrhage funds. The City imposed right at the outset of the case a new Retiree Health Plan that came in . . . several segments, but the net result is that there is now a much less generous Retiree Health Plan, and the retirees are required to contribute funds to pay a portion of the expense of that plan.

Id., at 14:12-21.

> [T]he City has declined to reject the [CalPERS] contract, saying it exercises its business judgment to conclude that the pension contract – that CalPERS is, in effect, the low cost provider of the City's pensions, and that it would, under any theory, cost more to use some other pension provider . . . .

Id., at 18:10-15.

> I have collective bargaining agreements that cover most of the employees that have been hammered out in part through this – well, hammered out over time and then reworked as part of this Chapter 9 case, and it has been made clear that the negotiations in those particular contractual negotiations were on a basis of the employees and their representatives saying, all right, we will give up certain aspects of our basic compensation, but we do not want any of the pensions touched. So all of the concessions that were made – and there are quite substantial concessions – were made on the income side, the direct income side, not on the pension side.

Id., at 21:11-22.

Consistent with those findings, the record reflects that the City had to take into account a number of legitimate business and economic considerations in negotiating the differential Plan arrangements for dealing with pensions, employee compensation and health care benefits for its current employees and retirees. Based on those considerations, we conclude that the bankruptcy court did not clearly err in finding that the Plan satisfied the requirements of § 1122(a) in its classification scheme.

Within Class 12 itself, all creditors received the same percentage payout on their allowed unsecured claims as $5,100,000 represented to the allowed aggregate amount of the Retiree Health Benefit Claims. The bankruptcy court found that "there is equal treatment with respect to all of the claims that are general unsecured claims" included in Class 12 and accordingly concluded that the requirements of § 1123(a)(4) had been satisfied. Again, we perceive no clear error in the fact findings that supported that conclusion.

The bankruptcy court noted Franklin's contrary vote but found that the general unsecured creditor class, Class 12, voted in favor of the Plan. Franklin is merely a dissenting creditor in the accepting class of general unsecured creditors. In these circumstances, "cramdown" analysis under § 1129(b) is not required, and we do not consider further Franklin's "unfair discrimination" argument based on § 1129(b). See, e.g., In re City of Colo. Springs Spring Creek Gen. Improvement Dist., 187 B.R. at 690.

D.  Best interests of creditors

Franklin argues that the bankruptcy court misapplied the "best interests of creditors" test in this case because it applied that test collectively, rather than individually and particularly with respect to Franklin's unsecured claim. Analyzing this issue requires consideration of the differences between chapters 9 and 11, both in terms of specific Bankruptcy Code provisions and the very different nature of the entities that seek to reorganize their affairs under each chapter.

Section 1129(a)(7)(A)(ii) provides that

> With respect to each impaired class of claims
> . . .
> (A) **each holder of a claim . . . of such class** –
> . . .
> (ii) will receive . . . under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the debtor were liquidated under chapter 7 of this title on such date.[7]

(Emphasis added.) Under § 901, § 1129(a)(7) does not apply to chapter 9 cases. Instead, chapter 9 includes its own "best interests" test in § 943(b)(7): "The court shall confirm the plan if – (7) the plan is **in the best interests of creditors** and is feasible." (Emphasis added.)

By their terms, the "best interests" tests in chapters 9 and 11 are different, and only in chapter 11 is particular consideration of the best interests of individual creditors specified. By its terms, the "best interests" test in chapter 9 is collective rather than individualized, and that interpretation is supported by the very context of chapter 9.

Franklin cites two decisions of the Supreme Court, <u>American United Mutual Life Ins. Co. v. City of Avon Park, Florida</u>, 311 U.S. 138 (1940), and <u>Kelley v. Everglades Drainage Dist.</u>, 319 U.S. 415 (1943), and one Ninth Circuit decision, <u>Fano v. Newport Heights Irr. Dist.</u>, 114 F.2d 563 (9th Cir. 1940), under the former Bankruptcy Act in support of its "best interests of

---

[7] Although this chapter 11 provision does not contain the phrase "best interests of creditors," it is colloquially known as the "best interests" test. <u>See, e.g.</u>, <u>Bank of Am. Nat'l Tr. & Sav. Assn. v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 441 n.13 (1999); <u>Sec. Farms v. Gen. Teamsters, Warehousemen & Helpers Union, Local 890 (In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890)</u>, 265 F.3d 869, 877 (9th Cir. 2001).

40

creditors" arguments. The relevant provision of the Bankruptcy Act, § 83(e), 11 U.S.C. § 403(e), provided that a required finding to support the approval of a plan of composition for a municipal authority was that the plan was "fair, equitable, and for the best interests of the creditors and does not discriminate unfairly **in favor of any creditor** or class of creditors." (Emphasis added.) In other words, § 83(e) of the Bankruptcy Act included a provision which, by its terms, protected the rights of individual creditors, i.e., the prohibition against unfair discrimination "in favor of any creditor . . . ." But this does not mean that all of the provisions of § 83(e) protected individual creditors rather than creditors collectively. None of the cited Bankruptcy Act decisions held that the "best interests" test under the Bankruptcy Act protected individual creditor rights.

The Supreme Court did state in Avon Park that, "The fact that the vast majority of security holders may have approved a plan is not the test of whether that plan satisfies the statutory standard. The former is not the substitute for the latter. They are independent." 311 U.S. at 148. However, that principle is reflected in the separate requirements in chapter 9 of the Bankruptcy Code with respect to class voting and acceptance in §§ 1126(c) and 1129(a)(8), both incorporated under § 901(a), and the "best interests of creditors" test in § 943(b)(7).

The concerns that caused the Supreme Court to grant certiorari in Avon Park regarding administration of the municipal reorganization process in light of the city's fiscal agent participating as a creditor in the case and purchasing other

41

creditors' claims at a discount to insure the required majority votes for approval of the plan are not present in this case. The "best interests of creditors" test is neither discussed nor analyzed in Avon Park.

Kelley was decided per curiam based on the Supreme Court's determination that inadequate findings supported approval of the subject plan. In Fano, the Ninth Circuit concluded that the district court clearly erred in determining that the irrigation district was insolvent "in the bankruptcy sense." Fano, 114 F.2d at 565-66. We do not find any of the decisions in Avon Park, Kelley or Fano dispositive or particularly persuasive in resolving the "best interests of creditors" questions presented in this appeal.

As noted by the bankruptcy court in its oral findings, applying the chapter 11 concept of "best interests" in chapter 9 is problematic "because it goes without saying that a municipality cannot be liquidated." Hr'g Tr. Oct. 30, 2014, at 40:20-21. Franklin recognizes in its reply brief that "a city cannot go out of business" but argues that the Plan betrayed the purpose of a chapter 9 plan of adjustment "to preserve the municipality so that it can generate revenues for future services **and** payment of creditor claims." Appellants' Reply Brief, at 10 (emphasis in original).

The bankruptcy court's determination that the Plan satisfied the "best interests of creditors" test is a finding of fact that is reviewed for clear error. United States v. Arnold and Baker Farms (In re Arnold and Baker Farms), 177 B.R. 648, 653 (9th Cir. BAP 1994), citing Kane v. Johns-Manville Corp., 843 F.2d 636, 649

42

(2d Cir. 1988).

Recognizing that "[a] municipality cannot be liquidated, its assets sold, and the proceeds used to pay its creditors," Collier suggests the "best interests of creditors" test in chapter 9 "should be interpreted to mean that the plan must be better than the alternative the creditors have. . . . Creditors cannot expect that all excess cash go to the payment of their claims. The debtor must retain sufficient funds with which to operate and to make necessary improvements in and to maintain its facilities. [Courts] must apply the test to require reasonable effort by the municipal debtor that is a better alternative to its creditors than dismissal of the case."  6 Collier on Bankruptcy ¶ 943.03[7][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.), citing In re City of Detroit, Michigan, Case No. 13-53846, "Oral Opinion on the Record," at 22-25 (Bankr. E.D. Mich. Nov. 7, 2014).  The bankruptcy court in the City of Detroit case similarly described the chapter 9 "best interests of creditors" standard in its written opinion on confirmation issues: "Courts generally agree that the best interests of creditors test in § 943(b)(7) requires 'that a proposed plan provide a better alternative for creditors than what they already have.'"  In re City of Detroit, 524 B.R. 147, 213 (Bankr. E.D. Mich. 2014), quoting In re Pierce County Housing Auth., 414 B.R. 702, 718 (Bankr. W.D. Wa. 2009), and In re Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999).  As noted by the bankruptcy court in In re Mount Carbon Metro. Dist.:

> This is often easy to establish.  Since creditors cannot propose a plan; cannot convert to Chapter 7; cannot have a trustee appointed; and cannot force sale

43

of municipal assets under state law, their only alternative to a debtor's plan is dismissal.

242 B.R. at 34.

In this case, the bankruptcy court clearly wrestled with these concepts in its oral findings at the Hearing:

The case law that is involved says, in effect, that [the Plan] must be the best possible plan under the circumstances and must be doing the best that is available under the circumstances. So I have looked long and hard at the history of this case and the responses that have been made and considered the alternatives, including the alternative of putting the whole situation back to square one, which is what would be required [if confirmation of the Plan were denied], and . . . running up many more millions of dollars in terms of expenses for the City for what I view as probably not likely very much difference, and that's because this Plan, I'm persuaded, is about the best that can be done – or is the best that can be done in terms of the restructuring and adjustments of the debts of the City . . . .

Hr'g Tr. Oct. 30, 2014, at 40:24-25; 41:1-11. Accordingly, the bankruptcy court concluded that the "best interests of creditors" test in § 943(b)(7) was satisfied.

Franklin argues that the bankruptcy court erred in its "best interests" determination essentially on two grounds. First, Franklin argues, how can the Plan serve the "best interests of creditors" when it receives an approximate 1% distribution on its unsecured claim and other creditors receive higher percentages on their claims?  Franklin's argument ignores the 100% payout it received on its allowed secured claim on the effective date of the Plan and the approximately $2 million distribution it is entitled to receive from the Reserve Fund held by its bond indenture trustee.  The bottom line is Franklin received the same payment treatment on its unsecured claim afforded to all of the

44

other general unsecured claimants in Class 12. The bankruptcy court found that Franklin's "17.5 percent overall return is not so paltry or unfair as to undermine the legitimacy of classification in the [Plan] or the good faith of the plan proponent." Amended Opinion, at 54. Franklin's complaints about the asserted better treatment afforded to creditors in other classes under the Plan invite us to make the apples to oranges to lemons to kumquats comparisons of Franklin's treatment to the treatments of creditors with widely varying security interests and settlement arrangements with the City. We decline the invitation.

Second, Franklin complains about implications from the evidence presented to the bankruptcy court in terms of future projections as to the City's evolving financial situation, focusing on the LTFP. In particular, Franklin questions the necessity for subsidies for "entertainment venues" and the enhanced reserves under the LTFP "for the proverbial 'rainy day' or 'prolonged downturn.'" Appellants' Reply Brief, at 13-14. "The [LTFP] increases the City's general fund cash reserve from its 5% historical average and 10% official policy to 16.67% of its budgeted annual expenses and then layers on a duplicative $2 million annual 'contingency.'" Id. at 14. Of course, the City's pre- and postpetition history, as reflected in the record in this case, confirms that whatever historical or aspirational reserves the City maintained in past budgets were not enough to protect the City from the fiscal ravages it experienced since the inception of the recession in 2007.

Ultimately, the question as to whether the Plan was the

45

"best" available proposal for the City to pay its creditors while maintaining its capacity over time to provide essential services to its citizens as opposed to any alternative, including dismissal of the chapter 9 case, was a factual finding for the bankruptcy court to make in light of the evidence before it. The bankruptcy court, after considering the evidence presented by the City and Franklin, determined that the Plan before it was "the best that can be done." We conclude that the "best interests" test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors. In light of that conclusion, we do not perceive any clear error in the bankruptcy court's determination that the City satisfied the "best interests of creditors" test under § 943(b)(7).

E. Not discounting Retiree Health Benefit Claims to present value

Franklin asserts that the bankruptcy court erred in not discounting the Retiree Health Benefit Claims in Class 12 to present value. The City argued that the Retiree Health Benefit Claims should be allowed in the aggregate amount of $545 million, as determined by the Segal Company ("Segal"), "a nationally-recognized actuarial and consulting firm with expertise in public sector benefits." Appellee's Brief, at 17. Franklin argues that Segal arrived at that number postpetition by "changing its methodology during the bankruptcy case only because the City instructed it to do so." Appellants' Reply Brief, at 35. Franklin has advocated for an aggregate amount for the Retiree Health Benefit Claims of $261.9 million, based again on Segal's

46

calculations and included in the City's audited financial statements.[8]

At the Hearing, the bankruptcy court determined the amount of the Retiree Health Benefit Claims as $545 million but stated, "[i]t's fair game for a Rule 52(b) Motion to try to get me to adjust that number." Hr'g Tr. Oct. 30, 2014, at 47: 22-24. Franklin accordingly filed the Motion to Amend Findings that the bankruptcy court addressed at its hearing on December 10, 2014.

At the hearing, the bankruptcy court first noted that the amount to be paid to the retiree health benefit claimants under the Plan was fixed and that no objection to the Retiree Health Benefit Claims had been made, so they were deemed allowed. It further noted that even if it accepted the $261.9 million number suggested by Franklin, Class 12 acceptance of the Plan would not be altered.

In analyzing the discounting issue, the bankruptcy court characterized the Retiree Health Benefit Claims as "an entirely unfunded benefit" because there were no funds available to pay them. It recognized that in applying a discount rate, "the lower the discount rate, the bigger the claim" and that determining an appropriate discount rate was a matter of much debate among economists. However, in reviewing case authorities and the language of § 502 "in the context of Chapter 9," the bankruptcy

---

[8] We have done the math. Substituting $261.9 million for $545 million as the allowed aggregate of Retiree Health Benefit Claims would increase Franklin's distribution on its Class 12 unsecured claim from approximately $285,000 (0.93578%) to approximately $593,540 (1.9473%).

court concluded that the Bankruptcy Code did not require it to discount the Retiree Health Benefit Claims to present value. Accordingly, it denied the Motion to Amend Findings and stood pat with its finding that the aggregate amount of the Retiree Health Benefit Claims was $545 million.

Section 502(b) provides that if an objection to a claim is made, "the [bankruptcy] court shall determine the amount of such claim . . . as of the date of the filing of the petition . . . ."[9] The question for us to determine is, did the bankruptcy court err **as a matter of law** in interpreting § 502(b) as not requiring it to discount the Retiree Health Benefit Claims to present value?

Franklin cites a number of decisions in support of its argument that § 502(b) plainly requires that claims with future payouts, like the Retiree Health Benefit Claims, be discounted to present value. See, e.g., Pension Benefit Guar. Corp. v. Belfance (In re CSC Indus., Inc.), 232 F.3d 505 (6th Cir. 2000); Pension Benefit Guar. Corp. v. CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.), 150 F.3d 1293 (10th Cir. 1998); Gas Power Machinery Co. V. Wisconsin Trust Co. (In re

---

[9] Technically, Franklin objected to the amount of the Retiree Health Benefit Claims proposed by the City, rather than directly to any claims filed by Retiree Health Benefit Claimants. However, at the Hearing, counsel for the City advised the bankruptcy court that Franklin, the City and the Official Committee of Retirees had agreed that "rather than force Franklin to file 1100 objections to claim, [the issue] would be handled as a matter of pure law as part of the confirmation process." Hr'g Tr. Oct. 30, 2014, at 46:14-16. We are comfortable in these circumstances that § 502(b) applies.

Wisconsin Engine Co.), 234 F. 281 (7th Cir. 1916) (pre-Bankruptcy Code decision); Pereira v. Nelson (In re Trace Int'l Holdings, Inc.), 284 B.R. 32 (Bankr. S.D.N.Y. 2002); In re Loewen Group Int'l, Inc., 274 B.R. 427 (Bankr. D. Del. 2002); Kucin v. Devan, 251 B.R. 269 (D. Md. 2000); In re Thomson McKinnon Sec., Inc., 149 B.R. 61 (Bankr. S.D.N.Y. 1992); LTV Corp. v. Pension Benefit Guar. Corp. (In re Chateaugay Corp.), 115 B.R. 760 (Bankr. S.D.N.Y. 1990); and In re O.P.M. Leasing Serv., Inc., 79 B.R. 161 (S.D.N.Y. 1987).

The City counters that some of the authorities cited by Franklin (In re CSC Indus., Inc., CF&I Fabricators of Utah, Inc., and In re Chateaugay Corp.) are neither helpful nor persuasive because they involve ERISA claims, and "ERISA, unlike the Bankruptcy Code, explicitly requires discounting to present value." Appellee's Brief, at 96. Some of the authorities Franklin cites are no longer viable, i.e., In re Loewen Group Int'l, Inc. (overruled); In re Chateaugay Corp. (vacated). In addition, the City argues that Franklin and many of the authorities it cites ignore the distinction in the Bankruptcy Code that where a present value determination is required, the term "value" rather than "amount" is used. See, e.g., §§ 1129(a)(7), (9) and (15); 1129(b)(2); 1173(a)(2); 1225(a)(4) and (5); 1325(a)(4) and (5); and 1328(b)(2). Congress' use of the different term "amount" in § 502(b) does not entail a discount to present value overlay.

Both parties cite the decision of the Third Circuit in In re Oakwood Homes Corp., 449 F.3d 588 (3d Cir. 2006), in support of their arguments. In Oakwood Homes, the question presented was

49

whether the bankruptcy court properly discounted the principal amounts of promissory note claims to present value after it already had discounted the claims for unmatured interest, as provided for in § 502(b)(2). The Third Circuit held that such further discounting was not appropriate based on its interpretation of the language of § 502(b):

> Stated simply, 11 U.S.C. § 502(b) speaks in terms of determining the "amount" of a claim "as of" the petition date. However, given that the remainder of the Bankruptcy Code uses the term "value, as of" to signify discounting to present value, and "amount" and "value" are not synonymous, we cannot say that § 502(b) clearly and unambiguously requires discounting to present value in all situations.

Id. at 595. The Third Circuit noted that neither "amount" nor "value" are defined in the Bankruptcy Code and focused on appellee's concession at oral argument that those terms do not "mean the same thing." Id. at 597.

> "Amount" is defined by one dictionary as "the total number or quantity; a principal sum and the interest on it." Webster's Third New Int'l Dictionary (unabr. 1965). "Value," in contrast, is defined as "the monetary worth or price of something; the amount of goods, services, or money that something will command in an exchange." Black's Law Dictionary (8th ed. 2004).

Id. at 597 n.8. But, "[w]here the [Bankruptcy] Code speaks of discounting cash streams to present value, it speaks in terms of 'value, as of' a certain date. It does not use 'amount . . . as of.'" Id. at 598. The Third Circuit ultimately concluded, "Viewing the Bankruptcy Code holistically, we cannot say that the language of 11 U.S.C. § 502(b) clearly and unambiguously requires the same discounting to present value as is required in other sections of the [Bankruptcy] Code." Id.

50

We realize from the cases cited to us that there is a line of authority to the effect that if an interested party objects to a claim, the bankruptcy court is to determine the amount of the claim "as of the petition date," and, accordingly, "[a]ny portion of the claim that is unmatured as of the petition date must, therefore, be discounted to its value as of the petition date." In re Trace Int'l Holdings, Inc., 284 B.R. at 38. See, e.g., In re O.P.M. Leasing Serv., Inc., 79 B.R. at 164-65. However, contrary authority also exists that interprets § 502(b)'s requirement that the amount of a claim be determined "as of the date of the filing of the petition" as making clear that § 502 only applies to prepetition claims. See 4 Collier on Bankruptcy ¶ 502.03[1][b] (Alan N. Resnick and Henry J. Sommer eds., 16th ed.).

We are persuaded by the Third Circuit's careful analysis and interpretation of § 502(b) in Oakwood Homes and conclude that the bankruptcy court did not err as a matter of law in determining that the Bankruptcy Code did not require it to discount the Retiree Health Benefit Claims to present value.

**CONCLUSION**

For the foregoing reasons, we DISMISS Franklin's appeal of the Confirmation Order generally as equitably moot and otherwise AFFIRM the bankruptcy court's decisions with respect to the treatment of Franklin's unsecured claim under the Plan.

51